# WILLIAM T. COULEHAN *vs.* WARREN C. WHITE.

*Elections and Voters—Ballots Defectively Marked—Different Kinds of Cross-Marks May be Used—Cross Not Within the Square—Distinguishing Marks on Ballots—Failure of Election Judges to Sign Return—Ballots Initialed on the Coupons—Ballots Without Initials.*

Code, Art. 33, sec. 61, as amended by the Act of 1901, ch. 2, provides that a voter after receiving an official ballot shall prepare the same "by marking with an indelible pencil after the name of every person for whom he intends to vote and to the right thereof, in the blank space provided therefor, a cross—for example (X)." And section 66 enacts that "if there shall be any mark on the ballot other than the cross-mark in a square opposite the name of a candidate, or other than the name of any candidate written by the voter on the ballot as provided by sec. 49, his ballot shall not be counted." *Held*, that where the cross-mark on a ballot extends into the line of the square, or where one or more of the lines of the cross-mark extend beyond a line of the square an infinitesimal distance, visible in ordinary light, but scarcely measurable, such ballots should be counted.

But when one or more of the lines of the cross-mark extend an appreciable distance beyond the line of the square, ballots so marked are to be rejected, since the crosses are not wholly within the square.

Since the statute requires the voters to make "a cross—for example (X)," without providing that no other kind of cross-mark can be used, ballots marked with a Latin cross or a Greek cross are to be counted as well as those marked with an X.

When some of the lines of the cross are double lines the ballot is valid, as the voter was simply undertaking to make the cross more distinct.

When one leg of the cross is not as long as the others, the ballot is not thereby invalidated.

When the lines of the cross-marks have slight curls or points at the end of the lines, which do not appear to have been so made for purposes of identification, the ballots are valid.

A spot of ink on the back of the ballot, apparently the result of an accident, or a wet pencil mark on its face made in folding, do not affect the validity of the ballot.

When the cross-mark was made with a blue pencil, the ballot is to be counted, since the statute does not prescribe the color of the pencil to be used, but only that it shall be an indelible pencil.

An election judge holding the ballots named Anthony Schriver, marked a ballot "A. Schr.," instead of using merely his initials. *Held*, that the ballot should be counted, there being no suggestion that such endorsement was made fraudulently for the purpose of identification.

When a ballot has on it distinguishing marks which may readily be used for the purpose of identification, it must be rejected.

Therefore, when the cross-mark, although wholly within the square, is in the form of a star, with more lines than are necessary for a cross, the ballot is invalid.

And where the mark is in the form of the letter V the ballot is to be rejected.

When there is a pencil made dot between the lines of the cross, that is a distinguishing mark requiring the rejection of the ballot.

The same rule applies to a ballot showing a pencil mark running about two inches across it, and to a ballot where the cross appears to have been rubbed out and made over again.

And also to ballots having letters or figures marked on them in ink.

When the proper number of councilmen to be voted for was five and a ballot shows that a cross-mark was made after the names of six, and one of the crosses afterward rubbed out, the ballot is to be rejected since this may have been done for purposes of identification.

Code, Art. 33, sec. 68, requires the judges and clerks at an election to sign a certificate showing the number of votes cast, etc. In one ward at a municipal election, where there were four judges and two clerks, the return was signed by only one judge and one clerk, the others stating in writing that they did not sign because they were in doubt whether certain ballots should be counted. *Held*, that the failure of the judges to sign the return does not prevent the ballots in this ward from being counted by the Court in a proceeding instituted to determine the true result of the election.

Code, Art. 33, sec. 61, as amended by the Act of 1901, ch. 2, provides that the election judge holding the ballots "having first written in ink the voter's name and number upon the coupon attached to one of them shall deliver said ballot to the voter after having likewise written in ink his own name or initials upon the back thereof." This coupon or stub is detached from the ballot when it is returned to the election judge to be deposited in the ballot-box. The statute also provides that no ballot without the endorsement of the name or initials of the judge thereon shall be deposited in the ballot-box and that the judges of election shall reject any ballots which do not have endorsed thereon the name or initials of the judge who held the ballots. At a municipal election the judge holding the ballots in a certain ward wrote his initials not upon the back of the ballot itself, but upon the coupon or stub. This mistake occurred in the case of every ballot voted in that

ward and was not noticed by the other judges or by the voters and was not the result of fraud or design. *Held*, that since the ballots when handed to the judge by the voters after being marked were identified as the official ballots by having the initials on the coupons and the error as to the place of putting the initials was explained, such ballots should be counted, and that the statutory provision that uninitialed ballots shall not be counted, does not contemplate a case such as this where none of the ballots found in the box were so endorsed and the absence of the initials fully accounted for.

But where only some of the ballots found in the box of a ward or precinct are without the initials of the election judge, the presumption is that such ballots were not officially given out and they are to be rejected.

Appeal from an order of the Circuit Court for Allegany County (BOYD, C. J., and STAKE, J.)

At an election held in the city of Cumberland on May 19th, 1902, W. T. Coulehan and W. C. White were opposing candidates for the office of Mayor. The return of the Board of Canvassers showed that Mr. White had received a majority of sixteen votes and was elected. Mr. Coulehan then filed in the Circuit Court for that county the petition in this case alleging that the judges of election had counted for White certain ballots which were illegally marked and should have been rejected and that some of the ballots counted for White did not contain the initials of the election judge, etc. The prayer of the petition was for "an order directing that said Warren C. White be notified by summons, in usual course of the pendency of this proceeding ; authorizing the taking of testimony in support of the allegations of this petition, as provided by law ; establishing such modes of proceeding and adjudging costs in this case, as to your Honors shall seem most satisfactory ; ordering and directing the Clerk of this Court, to whom the ballots cast at said election were returned by said Board of Supervisors of Elections, to produce any such ballots in regard to which testimony may be proposed to be taken before the justice of the peace taking examinations in this case, and to furnish said justice copies of the same where required, in pursuance of the terms and conditions of said order and subject to its restrictions ; directing the examination of said ballots in order to

ascertain which of them were improperly accepted and which of them were improperly rejected by judges of said election, and providing for ascertaining how many of the legal ballots cast at said election were voted for said Warren C. White and how many for petitioner."

Testimony was taken before a Justice of the Peace under an order of Court, and another order directed the examination of the ballots in a prescribed manner. The case was tried before the Court upon the evidence returned by the Justice of the Peace and upon an agreed statement of facts which was in part as follows:

"It is further agreed that when the ballot-box of ward number six was opened by the Court, under the order and agreement aforesaid, it was found that six hundred and twenty-three (623) ballots had been cast at said election and were in the box marked by the voters to vote for either the plaintiff or defendant; that four hundred and one (401) of said ballots had been marked by the voters to vote for the plaintiff; and two hundred and twenty-two (222) ballots had been marked to vote for the defendant; and that of thirty-seven of said ballots marked by the voter to vote for the plaintiff and twenty-one of said ballots marked by the voter to vote for the defendant, not one of the same had marked thereon, upon the back, or any other part thereof, the name or initials of anyone of said judges of election, or clerks, in ink or in any other manner. In addition to said fifty-eight ballots not initialed as aforesaid, there was one ballot marked to vote for the plaintiff, which had written on the back thereof, in ink, in the proper place, the letter "A," thus: A. and no other letter or name; and that one other of said ballots, in addition to said fifty-eight, marked to vote for plaintiff, had written on the back thereof, in the proper place, in ink, the following: A. Schr: And that one other of said ballots in addition to said fifty-eight marked to vote for plaintiff had written, in the proper place, on the back thereof, in ink, the letters A. S.; followed by the figures fourteen (14), with a mark across the same, thus: 14; and that all other ballots in said box, ex-

cept said sixty-one, were properly initialed, on the back thereof, in the proper place, in ink, by Anthony Schriver, one of the judges of election in said ward, in his genuine handwriting ; and that the writing on the back of the aforesaid three ballots, just above set out, was in the genuine handwriting of said Anthony Schriver, except as to the one upon which the figures fourteen (14) were marked, but who wrote said figures, or the mark across them, or in whose handwriting said figures are, is not known.

"It is further agreed that in said ward number six Anthony Schriver, John D. Bopst, Louis Spindler and H. L. Snyder were the judges of election, and John Craddock and T. E. McLaughlin were the election clerks ; that said Snyder and McLaughlin alone signed the election returns in said ward, which were properly returned therefrom duly sealed, directed and addressed, and that said Schriver, Bopst, Spindler and Craddock declined to sign said election returns from said ward number six, and stated their reasons therefor in writing, signed by themselves and by each of them, in words following : "We do not sign the returns from ward No. 6 for the election held May 19th because we are in doubt whether certain ballots should be counted," and enslosed a copy thereof with each return from said ward number six. And it is further agreed that said Schriver, Bopst, Spindler and Craddock never did sign or ratify said returns from said ward number six, except as stated.

"It is further agreed that in ward number six, the defendant objects to the counting of any one and all of the ballots in said ward because the returns therefrom have only been signed by one judge and one clerk, but the plaintiff claims that said ballots, if otherwise properly marked by the voter, should be counted notwithstanding said returns were only signed by one judge and one clerk ; and further claims, in case the Court should overrule said objection of the defendant made on account of the manner of said returns, that then all the ballots cast in said ward for the plaintiff and defendant, properly marked by the voter, should be counted accordingly.

"It is further agreed and admitted that the way and manner in which each and all of said ballots were marked in each of said wards, can be classified and have been classified by the parties hereto, so as to show the Court how each and every one of said ballots is marked, and that a true and accurate description of the way and manner each and everyone of said ballots is marked is set out in the following table of classes ; and it is admitted that each of said ballots is marked in one or more of the ways particularly described in said classes ; said classes of marks so agreed upon as correctly describing the manner in which all said ballots are marked, being as follows :

Class No. 1. Where part of the cross-mark extends to, but not beyond the inside of the line of the square.

Class No. 2. Where a line of the cross-mark extends beyond the inside of the line of the square and into the line but not to its outside edge.

Class No. 3. Where a line of the cross-mark extends across and to the outside edge of the line of the square.

Class No. 4. Where one or more lines of the cross-mark extend beyond a line of one or more of the squares an infinitesimal distance, visible in ordinary light, but scarcely measurable. A sample of this class is presented to this Court and to the Court of Appeals, by leave of Court and consent of counsel, by one hundred and three (103) original ballots of this class in ward No. three, forty-eight (48) of the same marked for the plaintiff and fifty-five (55) of the same marked for the defendant, which said one hundred and three (103) original ballots are presented as pictorial illustrations, in aid of the foregoing description of the marking of all ballots in said class four.

Class No. 5. Where one or more lines of the cross-mark extend beyond a line of one or more of the squares to a greater extent than the greatest extension included in class No. four.

Class No. 6. Where the cross-marks are made at right angles to each other and to the sides of the square and not

from the direction of the corners of the square, but are made wholly within the square, thus :

Class No. 7. Where the marks are made wholly within the square, but some of them are made by lines at right angles to the sides of the squares and some of them are made by lines pointing to the corners of the same, thus :

Class No. 8. Where the lines of the mark are made wholly within the square, not touching it, but the lines of the mark are not straight lines but curved or crooked lines, thus :

Class No. 9. Where the lines of the mark are made wholly within the square, not touching it, but some of the lines are double lines, thus :

Class No. 10. Where the mark although wholly within the square, is made with more lines than are necessary for a cross in the form of a star, thus :

Class No. 11. Where the lines of the mark although wholly within the square present only three sides of a cross complete, the fourth side being shorter or incomplete, the mark only having three legs, thus :

Class No. 12. Where the lines of the mark although

wholly within the square have slight curls or points at the end of the lines, thus:

Class No. 13. Where the marks, although wholly within the square, are somewhat in the form of a check-mark, thus:

Class No. 17. Where the voter has voted for six councilmen and then rubbed out the cross for one of the councilmen leaving five the proper number to be voted for.

Class No. 18. Where there is ink on the back of the ballot.

Class No. 19. Where there is a wet pencil mark on the face of the ballot, made in folding the ballot.

Class No. 20. Where there is a dot in the square with the cross-mark, dot apparently made with pencil, thus:

Class No. 21. Where the mark has a vertical line at the end of one arm but within the square, thus:

Class No. 22. Ballots marked correctly in every particular, but challenged by mistake.

Class No. 23. A long pale pencil mark running about two inches across page, apparently a slip of pencil.

Class No. 24. Where the cross is marked wholly in the square and made with blue pencil, but whether indelible pencil or not is not known.

Class No. 25. Blurred lines in square as if cross was rubbed and made over, or wet pencil mark rubbed with hand and cross made over it.

Class No. 26. Unchallenged and uncontested ballots conceded to be good when the examination was made.

Class No. 27. Where mark made with three lines somewhat in the shape of an "H," thus :

It is agreed that all of the ballots in said boxes were marked in one or more of the ways set out in the above classes of description and that any ruling upon said ballots by the Court below and the Court of Appeals should consider and treat all said ballots as so marked.

The following opinion in the Circuit Court was delivered by BOYD, C. J. and concurred in by STAKE, J., on October 20th, 1902.

In order that it may be more clearly understood what ballots the Court counted or rejected in this case, we will refer to the classes named in the agreed statement of fuct.

We counted those mentioned in classes 1, 2 and 3. We are satisfied that the case of *Duvall* v. *Miller*, 94 Md. (51 At. Rep. 570), does not require them to be rejected, as no portion of the cross-marks extends beyond the lines of the squares.

We rejected those in class 4 by reason of the decision in the above mentioned case. On many of those ballots the cross-marks extended so little beyond the lines that it would have been difficult tor the voters to have observed it and the Judges of Election could not well have detected this defect under the conditions surrounding them when the ballots were counted. It was impossible for a voter to have his ballot identified by this mode of marking it, and we would have counted those in this class did we not believe that the above decision precludes us from doing so.

We rejected those in class 5 as they are clearly within the rulings in *Duvall* v. *Miller*.

We counted those in classes 6, 7 and 8, as we do not understand the statute to prohibit those so marked. It requires the voter to mark his ballot with "a cross—for example," and then follows the twenty-fourth letter of the alphabet,

but we do not understand the Legislature to have intended that no other kind of cross can be used, or that it must be of that exact shape.

We counted those in class 9, as it is manifest the voters were simply undertaking to make the cross more distinct.

We rejected those in class 10, as the marks so used might readily be adopted for the purposes of identification.

We counted those in class 11, as we are satisfied those voters meant to make a cross, but it was simply incomplete by reason of one leg not being as long as the other.

We counted those in 12, because we think the benefit of the doubt should be given to voters, and are not satisfied that the curls or points at end were likely to be used as a means of identification.

We rejected those in 13 as that mark might be used for identification.

We rejected those in 17 because the marks appear on the ballots where the voters voted for six councilmen, and then rubbed one out. That might be done for purposes of identification.

We counted the one in 18 as the ink probably got on the back of the ballot during the count of the ballots. It was simply a blot and manifestly an accident.

We counted the one in 19 as the mark was manifestly made in folding the ballot.

We rejected those in class 20 as the mark is so placed on the ballots as to be a ready means of identification.

We counted those in class 21 for the same reason we did those in 12. The difference between the two classes being that those in 21 are more marked than those in 12, but both are apparently marked without design and simply as a result of nervousness or inexperience in the use of pencils. See Standard Dictionary for forms of crosses given by those authors.

Those in class 22 were conceded to be valid.

We rejected those in class 23 because the marks could be used as means of identification, and we cannot say they were not.

We counted those in 24 as the statute does not name the color of pencil and there is nothing to show that those used were not indelible pencils, as they probably were.

We rejected those in class 25 because they were so marked as to be readily used for the purposes of identification.

We also counted one vote for White, which had been rejected by the judges of election, and belongs to class 9, and one for Coulehan which was endorsed "A. Schr." being intended by Anthony Schriver, the judge holding the ballots, for his name or initials. The only doubt we have about the latter is that the sanction of such marking might enable a dishonest judge of election to identify ballots, but as there is no suggestion of that in this instance, we counted it.

There were no ballots under the other classes, except in No. 27, and as there was one for each candidate, we have not acted on it.

We rejected the uninitialed ballots in ward 6, including the one marked "a" and the one having the number 14 on it. The uninitialed ballots being within the decision in *Duvall* v. *Miller, supra,* and *Leonard* v. *Wolford,* 91 Md. 626, and the latter two being so marked as they might be identified.

We accepted the ballots in ward 6, subject to the classification in the other wards, as we did not feel justified in rejecting them by reason of the defective returns.

This brings us to the third ward, about which we have had the most difficulty. The testimony of Mr. Haller is that he put his initials on every ballot and it would seem to be equally clear that he wrote them on the back of the coupon, instead of on the ballot proper. Neither he nor any of the other judges detected the mistake, and not one of the ballots found in the box, when the polls were closed, had the initials on, as contemplated by the statute. As the coupons were torn off and destroyed, of course the initials did not appear on the ballots when taken out of the box. The question therefore is whether all of those 464 votes must be rejected by reason of this mistake of the election officers. Sec. 61 of Art. 33, provides that "the judge holding the ballots having first writ-

ten in ink the voter's name and number upon the coupon attached to one of them, shall deliver said ballot to the voter after having likewise written in ink his own name or initials upon the back thereof." It requires the voter to so fold it "that the signature or initials of the judge from whom he received it, and the name and number written on the coupon thereon, but nothing else thereon may be seen." It might be remarked in passing that if this be construed literally, it is a provision that cannot be complied with, as section 52 requires that there be printed "on the back and outside" the words "official ballot for," and a *fac-simile* of the president of the Board of Supervisors. The place where the initials are to be written is "upon the back thereof." We do not doubt that the Legislature intended it to be written on the body of the ballot, as the provision for the destruction of the coupons, and other provisions, show, but anywhere "upon the back thereof" is a compliance with the language of the law. The judge of the election holding the ballots thought the back of the coupon was sufficient, and put his initials there—doubtless forgetting that it would be torn off and destroyed, although under the language of the law it was perhaps easy for an inexperienced person to be so misled. The judge receiving the ballots does not seem to have observed the mistake, but it is perfectly manifest that he could identify the ballots thus marked as well as he could have done if initialed on the back of the ballots themselves. The voter after marking and folding his ballot hands it to the judge at the ballot-box, who, after the voter is identified, as the person who received the ballot, deposits it in the box, having first detached therefrom its coupon. That judge could see the initials on the coupon, as it is still on it when the voter hands him the ballot, and there could therefore be no question about identifying the ballot, as the official one handed to the voter by the other judge, to say nothing of the fact that the coupon and *fac-simile* of the signature of the President of the Board of Supervisors are on it.

The object of such provision is to prevent a voter from cast-

ing a ballot, which is not an official one, so as to guard against bribery.    No one can doubt that the purpose of the law was fully accomplished by what was done in this ward, and it only remains to determine whether the voters must be deprived of their votes by reason of a mistake of the election officers, although the plan pursued by them was in fact as well calculated to prevent what the statute aims at, as a strict compliance of the statute would have done.    It may be argued that some unofficial ballots may in this way have been put in the box, but the uncontradicted evidence is that Mr. Haller marked every ballot and Mr. Martz, who knew that the initials of the judge were required, accepted them.    It is therefore a fair and reasonable presumption that every one put in the box was an official ballot which had been handed to the voter.    It is unlike the case where some of a number of ballots found in the box of a ward or precinct do not have the initials of the judge, and there is no evidence to explain their action.    There is then a presumption against such ballots—the presumption being that as they were not initialed as the others were, and the judges of election being presumed to have done their duty, they were not the official ballots given out by the judge. But there can be no such presumption in reference to those in this ward in view of the uncontradicted testimony explaining how it was done.    When the Legislature said that any ballots which do not have endorsed thereon the name or initials of the judge shall be rejected, it evidently did not contemplate or refer to a case such as this, where none of those found in the box were so endorsed and the absence of the initials was not only accounted for, but shown to be by reason of the fact that they were by mistake of the judge marked on the stub instead of on the body of the ballots.    There is no suggestion of fraud or any intentional failure on the part of the judges to follow the requirements of law, and it is not intimated that any fraud was attempted to be committed by the voters themselves.

The Court of Appeals in *Duvall* v. *Miller* and *Leonard* v. *Wolford* were dealing with cases in which some of a number

of ballots were uninitialed without any explanation of the absence of the initials, and it has not construed these provisions of the statute where the facts were such as we have before us. It seems to us that there is a distinction and we will give the defendant the benefit of any doubt that exists, although by our conclusion on other points he was elected if the vote of this ward be rejected, notwithstanding the fact that we have given the petitioner the benefit of any doubt that might exist in reference to the vote of ward No. 6. The decisions elsewhere are by no means uniform. In the report of the cases of *Hope* v. *Flentge*, 47 L. R. A. 806, and *Slaymaker* v. *Phillips*, *ibid* 842, there are many cases on the subject, but we have not found any exactly similar to this where the testimony so clearly explains how the mistake was made. The dissenting opinion in *Slaymaker* v. *Phillips*, contains much that we approve of, although we cannot agree to all that learned Judge said. In *Caldwell* v. *McElvain*, 184 Ill. 559, the distinction we have suggested is intimated. It is there said that "the presumption is that the judges discharged their duty and if the voter cannot be deprived of his right to vote by the fraud or mistake of the election officers there should be something tending to show the existence of such fraud or mistake. In this case there was no evidence tending to show that the judges failed to put their initials on any ballots; and the Court was right in rejecting the ballots without such initials." The clear intimation of that Court was that the ballots would not have been properly rejected if the evidence had shown fraud or mistake on the part of the election officers. See also *Horning* v. *Burgees*, 77 N. W. Rep. 446; (Michigan case), where a number of authorities are collected.

As a summary on the above we have the following result for the respective candidates :

FOR MR. WHITE.

| | |
|---|---|
| Admittedly valid ballots in wards 1, 2, 4 and 5 | 388 |
| "    "    "    " ward  6 | 63 |
| Counted under class   1,   including ward 6 | 38 |
| "    2   " | 85 |
| "    3   " | 122 |

| | | | |
|---|---|---|---|
| Counted under class | 6 | including ward 6 | 2 |
| " | 7 | " | 12 |
| " | 8 | " | 3 |
| " | 9 | " | 57 |
| " | 11 | " | 20 |
| " | 12 | " | 19 |
| " | 18 | " | 1 |
| " | 19 | " | 1 |
| " | 21 | " | 9 |
| " | 22 | " | 3 |
| " | 24 | " | 8 |

One ballot rejected by judges of election in ward 6     1

     832

To which add votes for White in ward 3, according
   to foregoing classification, shown in agreed statement :

     153

     Total for White      985

       FOR MR. COULEHAN.

| | | | |
|---|---|---|---|
| Admittedly valid ballots in wards 1, 2, 4 and 5 | | | 276 |
| "    "    "    " ward 6 | | | 82 |
| Counted under class | 1, | including ward 6 | 55 |
| " | 2 | " | 93 |
| " | 3 | " | 191 |
| " | 6 | " | 4 |
| " | 7 | " | 6 |
| " | 8 | " | 10 |
| " | 9 | " | 44 |
| " | 11 | " | 17 |
| " | 12 | " | 31 |
| " | 21 | " | 6 |
| " | 22 | " | 5 |
| " | 24 | " | 6 |

One in ward 6 not included above     1

     827

To which add votes for Coulehan in ward 3, according
   to above classfiications     117

     Total for Coulehan     944

Thus giving the defendant 41 majority. It is perhaps proper to say that in speaking of admittedly valid ballots in ward 6, it was understood that all in that ward were objected to on account of the returns, but those referred to above were admitted to be valid in other respects. We will pass an order declaring Warren C. White elected.

. The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, SCHMUCKER, and JONES, JJ.

*William E. Walsh,* for the appellant.

Only one judge of election and one clerk signed the return from ward six, which was accompanied by a written statement from the other judges and clerk of the reason why they declined to sign the return. We submit that this is a strict and literal compliance with sec. 68, Art. 33 of the Code, which says : "If any judge or clerk shall decline to sign such return, he shall state his reason therefor in writing, and a copy thereof, signed by himself, shall be enclosed with each return."

Had the return in this ward been defective and such as the canvassing board should not have accepted, the Court had a right notwithstanding to resort to the original ballots to ascertain the will of the voters and the rights of the parties to this proceeding as determined thereby. *Leonard* v. *Woolford,* 91 Md. 634; *Magruder* v. *Swann,* 25 Md. 209. The record shows that the Court below examined the original ballots in ward six at the instance of appellee, and, that these original ballots had been preserved in the manner prescribed by law and were intact when opened by the Court for examination. The results of this examination cannot be disregard.

Concerning the uninitialed ballots in ward 3. The words of the law are : "no ballot without the endorsement of the name or initials of the judgᴇ thereon, shall be deposited in said ballot-box" (sec. 61.) "*No* ballot" excludes from the box every ballot without the endorsement, whether there be one such, a hundred such. or whether all in a ward be such. The word "no" signifies "not any ; not one ; none." Prof. Bain, in his Composition Grammar, page 107, speaking of the words "none, no," says : "This is the type of universal denial, and it is the most emphatic form of negation to be found in the language." The law does not stop short when it has provided that no uninitialled ballots shall be deposited. Says the Attorney-General of Maryland, in his "Instructions to Officers of Election and Registration," published with the "Registration

and Election Laws of Maryland" by the Secretary of State :
"The judge at the ballot-box must make sure that each ballot
handed to him has upon it the initials of the judge in charge of
the ballots, for under the law, no ballot without such initials
upon it can lawfully be deposited in the ballot-box.   Know-
ingly to put in the ballot-box any ballot without its having
such initials upon it, or wilfully to neglect to examine a ballot
to find out whether it has or has not such initials upon it is
an offence punishable by imprisonment," etc.   Whatever
weight may be due to Haller's profession of ignorance of the
requirements of the law, and to his assertion that he tried to
perform his duties under the law as he understood it, it is im-
possible to close one's eyes to the fact (1) that Martz, the judge
at the box, knew that the initials of the judge holding the bal-
lots should be on the back of the ballots, and to the fact (2)
that he did not look either before putting the ballots into the
box nor after taking them out of the box, to see whether
they were or were not initialled.  We have Martz's own words
for these two facts ; and so we are dealing with an election
officer who confesses himself, in the performance of his duty
as judge at the box, guilty of wilful negligence, such as may
amount in law to corrupt or fraudulent conduct.   Every
time he deposited a ballot in the box, having wilfully neglected
to look and see whether it had or had not the required initials
upon it, Martz, according to the opinion of the Attorney-Gen-
eral committed a crime which rendered him liable to impris-
ment, or fine, or both imprisonment or fine ; and Martz him-
self tells us that he did this every time he deposited a ballot
in the box, that is to say, four hundred and sixty-four times !
The pretense that in this cuse we have to do with an innocent
mistake, an act or mere inadvertence or oversight, as distin-
guished from a wilful neglect or corrupt violation of the law,
is utterly demolished by Martz's testimony ; and any argu-
ment based on that guileless and unwarrantable idea must go
with the foundation upon which it is rested.   If Martz had
even once done his duty, which he confesses he knew ; if he had
examined the first ballot handed him by voter and which he

admits he was aware should have been initialled, the whole trouble would have been avoided.

What shall be done with them? Three things, says the law. *First :* "But if deposited, shall be counted for the purpose of ascertaining the number thereof" (sec. 61),—so that, we submit, in making up the returns every ballot shall be kept track of, and any discrepancy between the number of ballots enumerated on the tally-sheet and the number of persons voting as shown by the poll-books, shall be accounted for: This is another contrivance of the law for preserving the inviolability of the ballot, because it prevents even the judge who held the ballots from slipping in ballots initialed by himself to take the place of those removed from the box without initials on them. *Second :* "And the judges shall in ink mark on the back thereof the word "Counted," and endorse their names (sec. 61)—the purpose of which requirement, we submit, is to prevent the initialing of the uninitialed ballots after their removal from the box ; and to preserve their identity as ballots deposited without initials and as ballots repudiated by the law for that reason as spurious and fraudulent. *Third :* "They shall reject * * * * * any ballots which do not have endorsed thereon the name or initials of the judge who held the ballots" (sec. 66). The Standard Dictionary, under the word "every," says : "*Any* makes no selection and may not reach to the full limits of *all* * * * * * a promise made to *any* may not reach *all*,"—which is, in other words, that *any*, includes *all* as well as a number less than all. In *McComas* v. *Amos*, 29 Md. 141, this Court says: "The word 'any' means every." In *Duvall* v. *Miller*, 94 Md. at p. 716, this Court interprets the provision that the judges "shall reject *any* ballots which are deceitfully folded together" meaning *all* ballots so folded. It is difficult to see why a like significance should not be given to the word "any" in the immediately following requirement that "any" ballots without initials shall be rejected ; and especially is this true when it is remembered that previously in the same statute the law provides that uninitialed ballots shall not be deposited at

all, in another section makes it a crime to deposit them, directs that they shall be branded with the word "Counted" and be endorsed by the judges,—whereas it makes but the one mention of deceitfully folded ballots that is found in sec. 66 in the words already quoted. If any conclusion is to be drawn from these facts, if any distinction is to be made in the interpretation of the law as between deceitfully folded ballots on the one hand and uninitialed ballots on the other, the fact that the law denounces the former but once, whereas it levels several separate and distinct provisions against the latter, would strongly indicate that the law looks with greater disfavor on uninitialed ballots, it is more careful to guard against them, more anxious to nullify them, than it is to reject deceitfully folded ballots. Yet this Court has held that "any" deceitfully folded ballots means "all" deceitfully folded ballots. It is impossible to escape the conclusion that the intention and design of the law is none other than to exclude all uninitialed ballots, whether part only or all of the ballots in a ward.

If the law means that uninitialed ballots shall be rejected only in case they form but part of all the ballots in a ward, how little a part, or how great a part, must they be? where shall the dividing line be drawn?

In this case it is said that the ballots in ward three are uninitialed by reason of a mistake, that Haller put his initials on the coupons instead of on the ballots themselves, and it is argued that, because this mistake extended to and affected every ballot in the ward, it shows absence of fraud and negatives an intention to wilfully disobey the law, and this alleged want of fraud and of intentional disobedience of the law is urged as reason for accepting these ballots, instead of rejecting them as the law so plainly requires. A stronger case in favor of accepting such ballots would be where the initials had been omitted designedly and with the corrupt purpose of causing the rejection of the ballots, for certainly Courts will go further to render nugatory corrupt efforts, or to undo results attained by such efforts, than they will go to remedy a situation brought about innocently or ignorantly. If this sort

of argument is to prevail, and if testimony explaining non-compliance with the law is to be substituted in lieu of compliance, then the election law as a binding force is at an end, and in each case we are remitted, not to an ascertainment and application of the law's mandates but to an investigation of the causes why they were disregarded or not observed. These causes determined, is like weight and equal effect to be given to each? If not, which of them shall necessitate the rejection of uninitialled ballots, and which warrant their acceptance? What weight shall be given to proven fraud? to alleged mistake? to confessed ignorance? to admitted negligence? to oversight due to hurry in a rush of voters? Where two causes contribute to the omission of initialling, and one of these causes is held to avoid the ballots, the other not to affect their validity, shall the judge who held them be called to testify that he omitted initialling such and such ballots—those in favor of his party's candidate, for example,—by reason of this innocent cause, and such and such others,—those of the opposition candidate, for instance,—by reason of this prejudicial cause?

The Legislature having commanded the voter to fold his ballot in a certain way, by the following of which he must necessarily arrive at a knowledge whether his ballot bears the required endorsement, will the Court hold that he is free to disregard the legislative injunction, or will it hold that, despite the fact that the law requires him to so fold his ballot as to display, and, consequently, to observe the endorsement, the voter shall not be presumed to know that law. In *Orr* v. *Bailey*, 80 N. W. 495, 499 (Nebraska), the Court holds that the voter "must take notice of the signatures of the two judges on the back of his ballot, and so notice as to materially assist in the process of casting the ballot and its identification prior to deposit by the proper official. The elector is charged with a knowledge of the law, and he can hardly escape the discovery, that the signatures are or are not on the back of the ballot when he folds it, and that it is or is not a ballot which can be used. To this extent he must be asked to give his atten-

tion, and that he is asked is certainly not destructive of the freedom of the election, nor do we deem it an impediment or a hindrance of the exercise of the election franchise, nor a new qualification of an elector."

There are a number of recent cases in which the constitutionality of requiring initialling has been declared, and in which the requirement is held to be mandatory. *Kelly* v. *Adams*, 183 Ill. 193; *Kelso* v. *Wright*, 81 N. W. 805 (Iowa); *McKay* v. *Minner*, 55 S. W. 866 (Mo.); *Miller* v. *Schallner*, 79 N. W. 865 (N. D.); *Orr* v. *Bailey*, 80 N. W. 495 (Neb.); *Slaymaker* v. *Phillips*, 47 L. R. A. 842 (Wyo.)

In the three last, all the ballots of one or more precincts were involved and were rejected. In *West* v. *Ross*, 53 Mo. 350, and in *Ledbetter* v. *Hall*, 62 Mo. 422, the Court rejected 251 and 247 ballots respectively, in each case all in the voting precinct, because not numbered as required by law. These cases indicated that Courts do not hesitate because of the number of ballots to be rejected by reason of obedience to the words of the law-makers.

The case of *Hehl* v. *Cuion*, 55 S. W. 1024, decided by the Supreme Court of Missouri, Division No. 1, on March 14th, 1900, is noticeable because it seems to stop short of the length to which the Supreme Court of Missouri, Division No. 2, went in the case of *McKay* v. *Minner*, decided February 20th, 1900 (55 S. W. 866), in interpreting the statute of that State which forbids the depositing of unintialed ballots in the ballot-boxes; and also because the statute of that State, inasmuch as it merely requires that ballots without initials shall not be deposited in the box, differs vastly from our own election law, which not only requires that such ballots shall not be deposited, but in addition provides that, if deposited, they shall be counted for the purpose of ascertaining the number thereof, shall be marked "counted" and endorsed by the judges (sec. 61), and that they shall be rejected (sec. 66), remembering that these provisions were part of the law under consideration in *Duvall* v. *Miller*, 94 Md. 697, where it was held that a number of unintialed ballots, less than all in a district, should be rejected

because so required by these provisions of our law, we presume the Court will not now lend an ear to the suggestion that the Legislature meant by the last few words of sec. 61 that uninitialed ballots, if deposited, should be counted not only "for the purpose of ascertaining the number thereof," as the statute says, but should also be counted for the candidates for whom marked, and especially because to so hold would be to annul the law's latest words on the subject, in sec. 66, that the judges shall reject such ballots.

"The account of the election at Lake precinct is a breeze from Arcady," is the opinion of the California Supreme Court of a situation concerning which it says the case of *Tebbe* v. *Smith*, 29 L. R. A. 676 : "In this case we are quite willing to believe that the misconduct of the officers of Lake precinct was prompted by nothing worse than ignorance, and lack of appreciation of the responsibilities of their positions, and we may say, further—for such is the evidence—that no harm is shown to have resulted from their conduct; but, looking to the purity of elections and integrity of the ballot-box, we are constrained to hold that conduct like this amounts, in itself, to such a failure to observe the substantial requirements of the law as must invalidate the election."

In *Duvall* v. *Miller*, 94 Md. 697, it was held that the voter's mark must be wholly within the square to entitle his ballot to be counted. The inquiry now is, what constitutes such a mark as the law requires the voter to make upon his ballot if he will have it counted. The statute uses the words "cross" and "cross-mark" and the sign or letter "X" in its efforts to make clear what it requires. We have not found in any accessible dictionary the two words "cross" and "mark" given or considered as forming one. The word "cross" has many significations, one dictionary enumerating as many as nineteen. The Standard Dictionary pictures the Greek cross + the cross oblique, X ; the Latin cross † the tau cross, T, and a number of other signs to which the name "cross" has been given. The law-makers, certainly aware of the multiplicity of definitions and figures of "cross," and alive to the uncertainty which must follow the

unexplained use of the word, come to the aid of the voter and tell him to "prepare his ballot by marking * * * in the blank space provided therefor, a cross—for example (X)—and in case of a question * * * a cross-mark (X) * * *." Here, then, we have the Legislature's illustrated definition of what it means by the words "cross" and "cross-mark," which is none other than what the Standard Dictionary pictures as the oblique cross, *crux decussata*, or St. Andrew's cross. That same Legislature says "if there shall be any mark on the ballot other than the cross-mark in a square opposite to the name of a candidate * * * his ballot shall not be counted" (sec. 66.) This Court held that this "cross-mark" must be made entirely within the square. Is it essential that this "cross-mark" shall be such a mark as the Legislature pictures? The solution of the inquiry will be found to depend upon the answer to be returned here to questions asked and answered in *Duvall* v. *Miller*. It follows, therefor, that the only "cross" or "cross-mark" that the voter has a right to make on his ballot, the only "cross" or "cross-mark" that this Court can countenance at all, is that contemplated and pictured by the statute in the sign—"X."

The requirement that ballots to be counted, shall be marked with X, is in its nature mandatory. *Duvall* v. *Miller*, 94 Md. 715; *Sego* v. *Stoddard*, 163 Ind. 297; *Taylor* v. *Bleakley*, 28 L. R. A. 683 (Kansas); *Whittam* v. *Zahorik*, 59 N. W. 57 (Iowa); *Curran* v. *Clayton*, 29 Atl. 930 (Maine); *Kearns* v. *Edwards*, 28 Atl. 723 (New Jersey); *In re Flyan*, 37 Atl. 524 (Penna); *State* v. *McElroy*, 11 South. 133 (Louisiana).

But, it is to be noted that in Maryland, it is not distinguishing alone that necessitate the rejection of ballots, but any mark on the ballot other than that designated by the law. We so understand *Duvall* v. *Miller*, which is in accord with the Maine Court (*Curran* v. *Clayton*, 29 Atl. 930), the New Jersey Court (28 Atl. 723, *Kearns* v. *Edwards*), and others. If only "distinguishing" marks are forbidden, immediattly the question arises, what is a "distinguishing" mark? and the door is opened at once for one opinion here, another there, and no certainty or uniformity anywhere.

Tested by these statements, which we conceive to be the law, the ballots in class 7—where the arms of some of the marks on a ballot are at right angles to the sides of the square, and the arms of other marks on the same ballot point to the corners of the square—should have been rejected. This class uses two distinct marks, the Standard Dictionary's Greek cross and its cross oblique—such an arrangement that it is indeed difficult to imagine how a voter could adopt it accidentally. This scheme, if sanctioned by this Court, will afford an easy way of evading the law and of defeating its object. The vote-buyer can instruct his victim to put the Greek cross after A's name, the cross oblique after B's name ; the vote-seller can obey these instructions and the execution of the scheme can be certified by corrupt election officials, challengers or watchers (*Sego* v. *Stoddard*, 136 Ind. 307.) Another combination of the same distinct marks can be used with another vote-seller, and so on through many variations. The ballot in this case contained fourteen names, a number quite sufficient to enable an ingenious briber—and these gentlemen are usually ingenious—by the use of $+$ and X to devise an extensive and effective system of tell-tale markings to be used by vote-sellers and to be witnessed by confederate officials. The question is not, whether bribery or other wrong has been done in this case ; the question is to guard against the possibility of its accomplishment, which is the object of the law.

Class 9, where some of the lines of the mark "are double lines," illustrated in the record by an X with a fifth arm, should have been rejected. The Court below counted this class "as it is manifest the voters were simply undertaking to make the cross more distinct." *Whittam* v. *Zahorik*, 59 N. W. 62, 91 Iowa, 23, shows that the Court of Iowa, where marks made "for the purpose of identifying the ballot" are expressly forbidden by statute, rejected ballots bearing "crosses made with more than two intersecting straight lines." Clearly the mark in class 9 is X ; but it is more than X—it is four armed X with a fifth arm added—it is X specified by the law plus something, plus a "mark on the ballot other than the

cross-mark" pictured in the statute (sec. 66.)   If such ballots bearing such marks are rejected in a State where only marks made "for the purpose of identifying the ballot" are forbidden, what shall be done in this State where the law prohibits absolutely "any mark on the ballot other than the cross mark"—X ?

Class 11, where the mark shows "only three sides of a cross complete, the fourth side being shorter or incomplete, the mark only having three legs," assuredly does not answer to the picture of a cross—X—shown in the statutes, certainly not to the idea of a cross held by ordinary people—for which two-fold reason we hold that it does not correspond with the idea in the mind of the law-makers when they enacted the election law, and that the ballots bearing this mark should have been rejected by the Court below.  It is scarcely reasonable to suppose that the Legislature had a different notion of a cross from that current among common people, or that they hunted up dictionaries to see how many different meanings are assigned to the word "cross," or that they searched for pictures and illustrations and descriptions in order to learn the number and shapes of the  different things to which the name "cross" had been given ; but if the Legislature did any of these things, and if it is to be judged by its words and acts, as ordinary men are judged, then it is fair to say that its investigations discovered to it what confusion must follow the undefined use of the word "cross" and that, consequently, the Legislature advisedly defined and pictured what it meant by the word "cross" and by the words "cross-mark" to wit, X ; and Courts and voters alike are bound thereby.

Of marks such as Class 11 the Iowa Court said, in *Voorhees* v. *Arnold*, 78 N. W. 797, paragraph 5 :  "Several of his markings do no more than have one line barely cross the other, so as to leave it somewhat in doubt if it really is a cross. In one of the squares the lines just meet ; that is, one line just reaches the other, so that it is not a cross.   Not being a cross it is an unauthorized mark, and does not indicate a choice or vote for the particular candidate."   Yet the Iowa statute, whilst prescribing the mark to be used by voters, only

requires the rejection of ballots bearing marks made "for the purpose of identifying the ballot."

It goes without saying that Class 11 mark added to Classes 7 and 9 would incline the buyers and sellers of votes to believe that the law is not such a bad thing after all.

Class 24 contains fourteen ballots whereon the mark is "made with blue pencil, but whether indelible pencil or not is not known." . The Court counted these "as the statute does not name the color of pencil." This Court said, 94 Md. 713–4, "that it was intended that the use of the indelible pencil should also be taken as mandatory." The statute then under consideration also provides that the supervisors of elections shall provide indelible pencils for marking the ballots at every election (sec. 54), from which it would seem to follow that it was part of the scheme of the lawmakers that the voters should use the indelible pencil so furnished. These blue-marked ballots were put in a class to themselves because they are blue-marked, and because they are in this respect marked differently, and so are distinguishable from all the other ballots cast at the election in question. If the letter of the law fails to specify the color of pencil to be used, assuredly its spirit requires that the same color be used by every voter. Otherwise the way is opened for endless frauds whereby the great objects of the law will be utterly defeated ; for no doubt indelible pencils can be and are made in a variety of colors. The corrupt, whether buyers or sellers of votes, or whether intimidators of the dependent and weak, are waiting with eagerness for the day when this Court will nullify the election law by declaring that it permits to voters the use of many different colors of indelible pencils, and the marking of ballots with many varieties of marks other than the X prescribed by the law. The Court must continue to construe the law as it has begun its construction, by insisting upon a strict and literal compliance with the law's mandates—either this, or throw down the bars behind which the lawmakers would secure the secrecy and inviolability of the ballot. Any one mark, and any one color of pencil with which to make it, and

the objects and purposes of the law are attained. The moment two or more marks or two or more colors, whether totally different or mere varieties of one another, are held by this Court to comply with the law, that moment the attainment of the objects and purposes of the law is rendered impossible.

*Benjamin A. Richmond* and *Albert A. Doub* (with whom was *David A. Robb* on the brief ), for the appellee.

It was wholly immaterial after the judge received the ballot back from the voter and identified it and put it in the box, whether the initials were still on the ballot or not. The plain object of the law was to get into the ballot-box the identical official ballot, which had been handed out by the judges and when that was done there was no possible way in which (if the judges did their duty) a fraudulent ballot could get into the box ; there were no fraudulent ballots in the box, as is shown by the fact that the number of the ballots found in the box corresponded exactly with the number of voted names on the poll-books. We have here then a case, which never was contemplated by the Legislature ; a case in which the letter of the law has been strictly complied with and the object of the law has been fully carried out, and yet a case differing in one respect from any possible situation contemplated by the Act of the Assembly, and because of this difference in an immatierial detail, not contemplated or provided for by the Legislature, are the voters of a whole ward of a city to be disfranchised *en masse*, or five hundred and forty-four voters otherwise competent, backed by the constitutional guarantee of their suffrages, to be deprived of them, merely because a judge of election with the most honest intentions inadvertently has done that, which offends neither against the letter, object nor spirit of the law, under which the election was held ?

When, therefore, the Legislature said in section 66 that "they (the judges) shall reject any ballots which are deceitfully folded together and any ballots which do not have endorsed

thereon the name or initials of the judge who held the ballots," it is clear it did not have and could not have any reference to the case at bar ; if a large number of the ballots in the box had been initialed and some were found without initials, as was the case in ward No. 6, there the presumption is, of course, against the validity of said ballots ; they are there unexplained, with no evidence that they ever had been initialed, or identified in any way before they were put in the box. It is very easy to see why the law provided that such ballots should be rejected ; they are stamped with the suspicion that they were not handed out by the judges, but fraudulently imposed by the voter upon said judges. No such suspicion or presumption, however, can be indulged in with regard to the ballots in ward 3 ; they were initialed and they either were or could have been identified before they were put into the box, and if the judges did their duty they were so identified and the voter has a right to rely upon the presumption that the judges of election did their duty. *Moyer* v. *Van De Vanter*, 12 Wash. 377; 50 Am. State Rep. 903.

In *Jones* v. *State*, 153 Ind. 450, the poll clerks wrote their initials upon the outside upper right hand corner of each ballot before it was delivered to the voter. The statute prescribed that they should be written upon the outer lower left hand corner. The Court said : "To hold that all prescribed duties of election officers are mandatory, in the sense that their non-performance shall vitiate the election, is to engraft upon the law the very powers for mischief it was intended to prevent. If the mistake or inadvertence of the officer shall be fatal to the election, then his intentional wrong may so impress the ballot as to accomplish the defeat of a particular candidate or the disfranchisement of a party. And it is no answer to say that the offending officer may be punished by the criminal laws, for his punishment will not repair the injury done to those affected by his acts. It is the duty of the Courts to uphold the law by sustaining elections thereunder that have resulted in a full and fair expression of the public will, and, from the current of authority, the following may be

stated as the approved rule ; all provisions of the election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose ; but after election, all should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void. See also *Parvin* v. *Wimbern*, 130 Ind. 570.

A voter should not be deprived of his rights as an elector either by the fraud or the mistake of the election officer if it be possible to prevent it. *Hodge* v. *Linn*, 100 Ill. 401; *Hehl* v. *Guion*, 55 S. W. Rep. 1026; *State* v. *Gay*, 60 N. W. Rep. 677, 47 L. R. A., 808 notes; *Gumm* v. *Hubbard*, 97 Mo. 311; *Caldwell* v. *McElvain*, 184 Ill. 559; *Horing* v. *Burgees*, 77 N. W. Rep. 446.

These authorities, taken in connection with those cited by the Court below, in support of its ruling, in rejecting plaintiff's first prayer, show, we believe, the current of judicial decisions on this and similar questions so far as the same have been decided in this country. In many of them, the validity of the votes was sustained on a state of facts varying much more widely from the requirements of the statute than the facts in the case at bar. Here it is obvious that no substantial error was committed and no wrong done to the integrity of the election and that no wrong could have been done. If a trifling distinction of this kind is to be held in this State as sufficient to vitiate an election and entirely defeat the will of the people, it is perfectly obvious that the stringency of election laws will soon be seized upon by designing persons as a convenient means of fraud and thus become a powerful engine for the defeat of the very purpose for which the measure was enacted. We take it to be clear that Courts ought to be and will be more jealous of the constitutional rights of the voters than astute in relying upon immaterial technicalities to cast out a whole ward or district in an election.

We, therefore, respectfully insist that the ballots in both ward No. 3 and ward No. 6, if otherwise properly marked, should not be rejected as a whole for the above errors in the election officers, but should both be counted; but if the votes of ward No. 3 are not to be counted, then by the same token we invoke the letter of the law to exclude also the votes of ward No. 6 *en masse.* This point is raised by our first and second and appellant's first prayer. That a failure of a majority of the election officers to sign the returns, has caused their rejection by some Courts at least, we refer to the following cases: *Jackson* v. *Wayne,* Cl. and H. El. cases, 247; *Niblack* v. *Walls,* Smith Election cases, 103; *Perry* v. *Whittaker,* 71 N. Car. 475.

Class 9. The marks are wholly within the square, not touching it; it is a cross-mark; there is no part of it on any other part of the ballot except in the square and the fact that the voter at the first stroke of his pencil failed to make a plain mark and made a second mark over the first to be sure of making his cross, throws no suspicion upon the ballot. There is no evidence that it was used as a distinguishing mark, and as we understand the ruling of Duvall and Miller the Court cannot look at the marking of the ballot with an eye to determining whether the voter has marked it with such marks as the Court might construe to be distinguishing marks.

If, therefore, the marking under this clause, in no way offends against the statute law, the judges of election can institute no inquiry as to the intention of the voter in making any kind of mark. They cannot go into the question whether the mark looks like a distinguishing mark; if the mark literally complies with the law, that is the end of it; no discretion is left with the judges of election. Here the marks under class nine are certainly cross-marks; the statute does not prescribe any particular kind of a cross, or whether it shall be made with two strokes of the pencil, or three. This mark is certainly a cross-mark and it is certainly no less a cross-mark because part of one line is marked over with a second stroke of the pencil; besides it must be remembered that the Act of

Assembly does not undertake to limit the voter in the form of his cross ; it says he shall make "in the blank space provided therefor, a cross—for example (X);" this example does not show perfect cross ; it shows a cross-mark with four straight sides, and a cross at the end of each arm of the cross; and besides this form of cross is only given for example. Unless, therefore, we are to reduce the whole election law to an absurdity, by quibbling of this sort, there is nothing whatever to support this contention.

Class 11. The same argument applies to this class. The sample given in the agreed statement of facts presents a case where the lines of the cross are wholly within the square, and there is nothing else on the ballot which offends against the statute ; the only complaint being that the fourth side of the cross is shorter or incomplete. There is nothing said in the statute as to how long the arms of the cross should be.

On the subject of these sub-classes, we cite the Court to the following instructive case where very similar questions arose as to the sufficiency of the various markings of crosses, and wherein the Court overruled such objections as frivolous and not sound. *State* v. *Sadler,* 58 Pac. Rep. 291.

What constitutes an identifying mark upon a ballot is a question of fact for the trial Court or jury according as the trial may be had, and the finding of either upon such question is conclusive on appeal. *Kelso* v. *Wright,* 81 N. W. Rep. 805.

## PER CURIAM.

With the exception of the rulings in relation to class 4 the rulings and order appealed from will be affirmed for the reasons given in the opinion of the Court below.

In our opinion the ballots included in class four were erroneously rejected and should have been counted, because they were not illegally marked within the rule laid down in *Duvall* v. *Miller,* 94 Md. 697. Inasmuch as the counting of the ballots in class 4, instead of rejecting them makes no change in the result, but only adds to the majority of the candidate declared elected by the Court below, the judgment will be affirmed without a new trial.            *Judgment affirmed.*

(Decided December 17th, 1902.)