GEORGE H. STROTT ET AL. *v.* WILLIAM F. BROENING, ET AL.

[No. 30, January Term, 1931.]

*Decided March 20th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE and SLOAN, JJ.

*Raymond S. Williams* and *Roger B. Williams,* with whom were *Hershey, Donaldson, Williams & Stanley,* on the brief, for the appellants.

*Allen A. Davis, Assistant City Solicitor,* for the appellees, with whom were *A. Walter Kraus, City Solicilor,* on the brief, for the Board of Estimates, appellee, and *William H. Lawrence,* on the brief, for the City Service Commission, appellee.

562

PARKE, J., delivered the opinion of the Court.

George H. Strott and two other citizens, voters and tax-payers of Baltimore City, instituted these amended proceedings for: (1) The grant of a writ of mandamus to be directed against William F. Broening and others, who constitute the board of estimates of the Mayor and City Council of Baltimore, commanding them forthwith to reconvene as a board and to allow and include in the proposed ordinance of estimates, for the year 1931, the sum of $3,800, which had been estimated in writing by the city service commission to be necessary for the performance of its statutory duty in respect of covering into the classified city service the laborers now employed, and those to be employed, by the City of Baltimore; or that said sum of $3,800 be allowed by said board of estimates to said city service commission out of the sum of $150,000, set up by the said board of estimates as a contingent fund in said proposed ordinance of estimates for the year 1931; and, also (2) the grant of the writ directed to John G. Rolker, William H. Lawrence and Ralph F. Proctor, who constitute the city service commission of Baltimore, commanding them to cover into the classified city service of Baltimore all those laborers now employed and to be employed by the said City of Baltimore. For convenience the words board and commission will be used to designate the two respondents. A demurrer was overruled to the original petition, and the respondents severally answered, issue was joined, a jury trial waived, and testimony was offered on the part of the relators, who, at the close of their evidence, by leave of court, amended the form of the writ desired. The respondents did not offer any testimony, and the board submitted the only prayer, which was to the effect that there was no legally sufficient evidence upon which a writ of mandamus could issue against the board. The court granted this prayer, and dismissed the petition against, not only the board, but also the commission. Two of the relators have appealed from this judgment. The questions arise on seven bills of exceptions, but there is no occasion to consider

any but the last, which relates to the action of the court in granting the prayer.

Among the duties imposed by the charter of Baltimore City is the making of three lists of moneys to be appropriated by the city council for the next ensuing fiscal year. One of these lists is known as the "departmental estimates" of the amounts estimated to be required to pay the expenses of conducting the public business of the municipality for the next fiscal year. In order to enable the board to make this list, the various municipal administrative units are required to make and send to the board estimates in writing of the amounts needed for the next fiscal year, and to specify in detail the objects and the items, including a statement of the salaries of those serving in any capacity. The three lists are similarly prepared, so that, together, they shall embrace all moneys to be expended for the ensuing fiscal year for all municipal purposes. When these lists are thus prepared, the board shall cause a draft of an ordinance to be prepared, to be submitted to the city council, that will provide appropriations sufficient to meet the amounts called for by the three lists, and a copy of the proposed ordinance, when certified by a majority of the members of the board, shall be published as prescribed, and, immediately after the expiration of the publication, the board shall transmit a copy of the draft of the proposed ordinance to the president of the city council, whereupon a special meeting of the city council shall be called to consider the proposed ordinance, and, when so assembled, the duty is imposed upon the city council to consider and investigate the estimates contained in the proposed ordinance, and to remain in daily sessions for its consideration until an ordinance is passed.

The city council shall not have the power to increase the amounts fixed by the board nor to insert new items, but, by a majority vote of all its elected members, the city council may reduce the amounts, except such items as may be fixed by law, or may be inserted to pay state taxes or the interest and principal of the municipal debt. After its passage and approval by the mayor, the several sums of this ordinance of

estimates for the designated year are exclusively appropriated for the several purposes therein named for the specified year. Not only are the amounts not to be diverted, but the city council is without the power to enlarge any item contained in the ordinance after it is duly passed. Section 36, Baltimore City Charter (1927).

In pursuance of these requirements, the city service commission prepared and submitted to the board its written estimates of the amounts needed for the fiscal year 1931. The commission was created for the purpose of introducing the method of appointing municipal officers and employees for merit and of securing them against removal except for cause. It has three members, who serve without pay, and it began to function on January 1st, 1920. Its powers and duties are set forth in sections 203A to 203Q, both inclusive, of the Baltimore City Charter (1927). With the exception of positions of teachers or supervisors, who are appointed by the board of school commissioners, as provided in sections 100 and 101 of the Charter, all the municipal officers and positions, which are filled pursuant to any law or ordinance relating to Baltimore City by any municipal official or body other than the mayor or the city council, are required to be separated by the commission into four classes, which are respectively denominated as exempt, competitive, noncompetitive, and labor, which constitute the classified city service of Baltimore, and no appointment shall be made in any of these classes, except under and according to the rules which the commission was directed to promulgate. The law defines these classes. The exempt class is declared to embrace all offices or positions, except those of laborers, which shall be specifically named in the rules of the commission as impracticable to be filled by competitive or noncompetitive examinations; the competitive class is declared to include all other positions in the service for which it is practicable to determine the fitness of the applicants by competitive examination, and covers all positions which are within the service and which are neither in the exempt, the noncompetitive, nor the labor class; the noncompetitive class is composed of the

positions which are neither in the exempt nor the labor class, and which it is not practicable to include in the competitive class; and, lastly, the labor class is formed by the unskilled laborers and such skilled labor as may be classified by the rules and regulations of the commission, exclusive of any person whose service shall consist of clerical work, office work, or inspection of other work or service. Sections 203 D-H of Baltimore City Charter (1927)..

The commission is required to make rules to carry out the purposes of this civil service legislation, and to provide for the appointments and employments in all positions in the classified service on the basis of "merit, efficiency, character and industry," and it is obligatory that the promulgated rules shall provide: (a) For examinations and other tests as may in its judgment be necessary to determine the fitness of applicants for positions in the competitive and noncompetitive classes; (b) for the employment of those in the labor class, either in the order of priority of application, or by selection on account of fitness, or by such other methods as the commission may find will produce the best results; (c) for the rejection of candidates who fail to comply with reasonable requirements as to age, sex, physical condition, and moral character; (d) for the preparation of lists of candidates eligible for employment, which lists in the case of the competitive class shall be arranged in the order of the relative standing of applicants as determined by the commission; and (e) for the certification, as occasion may require, to the appointing officer, of the persons eligible to employment under the rules of the commission, provided that, in the case of the competitive class, such certification shall include only the five persons standing highest on the appropriate eligible list, or the person or persons on such list when it contains five names or less. Section 2031.

The rules adopted, which have any relation to the cause at bar, are Rules 8, 13 and 33. The first one named provides that the commission by minute shall designate the classes of position that involve common labor services, and none other shall be within the labor division. Rule 13 requires that any

one desiring a position in the labor division shall make his application in writing for the fitness tests prescribed, and the chief examiner shall maintain a register of applicants, upon which shall be entered, in the order of priority of filing application, the name, address and date of every application according to the position desired in the class embraced in the labor division, and this registry shall be utilized in filling vacancies in positions in any class for which applicants have filed, whenever there is no eligible or re-employment list as provided in Rule 33. By the last-named rule, it is specified that, whenever vacancies occur in any position, the official who is to make the appointment shall make a written request of the chief examiner, in which shall be stated the kind of labor needed, the pay and probable length of employment, the number to be employed, and the date on which and the time and place at which the applicant is to report. Whereupon the chief examiner shall notify, in the order of their standing on the eligible list, twice the number to be employed to report at the designated time and place, and shall send to the official, who has made the application, a list of the laborers thus notified. The official shall then appoint, from those who report at the designated time and place, the number required in the exact order of their standing on the eligible register, and shall make prompt report to the commission of his action with the names of those appointed. The Rule 33 further provides that, in case of emergency, where it is not practicable to secure laborers from an eligible registry with sufficient promptness, the appointing officer may employ, subject to the subsequent approval of the commission, as many persons as may be required, but no such emergency employment shall continue for more than five days, unless extended by the commission by action on its minutes.

When a vacancy occurs or a new position is created in the classified service, other than the exempt class, the appointing officer must fill such position provisionally by one of the persons who has been certified to him. The appointee is on probation for a period of six months, and, at or before the end of this period, the head of the department or office may,

in the exercise of his discretion, remove the appointee, whose appointment, unless he be so dismissed, shall be deemed complete. Should an emergency arise, or if the services to be rendered are only for a temporary period, not to exceed sixty days, the appointing officer may, with the approval of the commission, make a temporary appointment to remain in force not exceeding sixty days, and only until a regular appointment under the provisions of the Charter can be made.

The Charter contains other provisions in reference to promotions, transfers, reinstatements, removals; to a roster of employees; to offices with their functions, duties, powers; to the inhibition of payment of any salary or compensation to any officer, clerk, employee, or other person in the classified city service, whose name is not upon the roster as having been appointed and employed in conformity with the provisions of the charter and the rules of the commission. Sections 203O, 203J-Q. The particularity and comprehensiveness of these and other provisions of the Charter on this subject make plain the purpose and mandatory nature of the duties of the commission. Section 203Q. This body of three members is obliged to appoint a chief examiner, who shall act as secretary of the board and register of labor, and who, under the direction of the commission, shall superintend the examinations, supervise the administration of the rules, and perform such other duties as the commission may prescribe. His yearly salary is not to exceed $4,000. The commission may appoint such other employees, fix their salaries, and incur such expenses as may be necessary, but the aggregate thereof is not to exceed the amount fixed therefor in the annual ordinance of estimates. The commission now employs a chief examiner, an assistant chief examiner, a stenographer-secretary, four clerks, one typist, and a full-time medical examiner, making a total of nine.

The commission has apparently performed its official duty with respect to the exempt, competitive and noncompetitive classes, but, notwithstanding the clear and imperative obligation imposed by the Charter, the commission has never carried out the requirements of the Charter with respect to the

labor class. Since its organization the commission has never had available a registry or list of laborers eligible for service as contemplated by the Charter, and no appropriate action has been taken to compel it to assume and discharge its manifest obligation. For some time it was, therefore, necessary for the heads of departments to hire laborers on their own initiative, but, since the creation of a municipal employment bureau, an agency of the city that originated during a period of industrial depression, and has since been maintained, to secure places for unemployed laborers in private industry, this bureau, which has developed into a center for the concentration of the idle laborers and their allocation in new employment, supplies the laborers for municipal employment. When a laborer is so secured, the commission is notified in order that his name may be put on the roster of employees that the commission is required to keep, where it remains if he can pass the physical examination prescribed by the commission. This manifest evasion of the charter has continued until the present, and it should not be suffered to endure.

During the period embraced between 1922 and 1930, both inclusive, the city has appropriated for the support of the commission sums in varying annual amounts, but fluctuating between $16,600 and $20,650. Beginning with 1923 and ending with 1929, the commission has yearly requested an allowance varying between $2,420 and $5,200 for the purpose, as was stated, of enabling the commission to perform its duties in respect of the labor class, and the board has consistently rejected these requests. In 1930, the commission omitted this request.

Finally, in submitting its estimate for the year 1931, the commission estimated its requirements at $25,000, which included, under the heading of "The establishment of a Labor Registration Division as required by the Charter," $1,300 for a new clerk, and $2,500 for two assistant medical examiners, which aggregated $3,800. At the time the estimate was presented, the commission requested the board to grant it a hearing in order to advocate its reasons for the increase.

The board consented, and two members of the commission appeared before the board and submitted a written statement over the signature of the three members, to the effect that the request for the appropriation of $3,800 was to provide medical and clerical help in order to establish a labor division. At the same time, the president of the commission, its attorney, and a second attorney, addressed the board, which heard their arguments. Shortly afterwards the board further considered the matter and decided, after deliberation and conference, to allow the commission an increase of $500 in its expense account, but to reject the allowance of $1,300 sought for another clerk, and of $2,500 for two assistant medical examiners, who would give a part of their time to the commission. The amount ultimately allowed by the board was an appropriation of $20,300, of which the sum of $17,300 was to pay the salaries of the nine subordinates, and $3,000 was for the expenses during the year 1931.

The testimony adduced showed unmistakably that the commission had consistently declined to comply with its manifest duty in reference to the employment of laborers, because its demand for a larger force, which the commission believed necessary, was not granted. On the other hand, the testimony demonstrated an equal persistency in the refusal of the board to allow an increase. The testimony is conclusive that the board declined to enlarge the commission's corps of assistants, for the fiscal year 1931, because it was of the opinion that the force of the commission was sufficient to discharge every duty which the commission was bound by the Charter to perform. The Charter committed to the board the preliminary decision of this difference of opinion. It was not until after notice, a hearing, and due deliberation, that the board came to the considered conclusion that more work by those then its employees, rather than more money for more employees, was what was requisite for the complete accomplishment of every official duty imposed by the Charter on the commission. It may be that this determination was not the sounder, or was even an erroneous view, but the court cannot substitute its discretion and judgment for that of the

designated administrative agency which could find one way or the other, and whose action here cannot be reviewed by the writ of mandamus, as it does not clearly and convincingly appear that the board has acted arbitrarily or in a plain and willful disregard of duty. *Manger v. Board of Examiners,* 90 Md. 659, 671, 672, 45 A. 891; *Woods v. Simpson,* 146 Md. 547, 551, 126 A. 882; *Graham v. Gaither,* 140 Md. 330, 117 A. 858; *Henkel v. Millard,* 97 Md. 24, 54 A. 657; *Merrill on Mandamus,* secs. 37, 40, 41, 126; *High on Extraordinary Legal Remedies,* secs. 325, 328, 345, 42, 43; *Baltimore City v. Gorter,* 93 Md. 13, 48 A. 445.

There is an element of novelty in the theory that a highly controversial matter, admitting of a reasonable difference of honest and informed opinion, such as the necessity for one or the other number of agents to do a variable amount of work, can be the basis for the losing protagonist to enforce his particular view by mandamus after the question has been honestly and fairly, although, perhaps, mistakenly, resolved by the authorized agency.

It is clear that the relators can have no writ issue against the board. While the prayer granted relates to the board alone, the questions here are not so confined. As was decided in *Manger v. Board of Examiners,* 90 Md. 659, 673, 45 A. 891, 895, where the issues of fact have been determined by the judge, sitting without the aid of a jury, this tribunal is not, as in ordinary appeals from a court of law, confined to a review of the rulings on questions of law presented by exceptions. In such instances, the appellate court must inquire whether the writ was properly granted or refused, after an inspection of the whole record, and is not restricted to an instruction, or limited to determining whether that instruction was right or wrong, particularly as no instruction is needed as a basis to bring up for revision the final order, when the case is heard in the trial court without the intervention of a jury. As was said in that case: "It is the final order granting or refusing a mandamus which an appeal to this court assails, when the case has been tried by the judge alone; and, whatever the instructions may be, if there are

any, the accuracy or inaccuracy of that order is the thing to be determined" *Whitridge v. Pope,* 110 Md. 486, 487, 73 A. 288; *Woods v. Simpson,* 146 Md. 547, 549, 126 A. 882.

As a consequence of this rule, the court will, in this case, pass upon the right of the relators with respect to both the board and the commission.

The writ will not be directed against the board and the commission, since their functions and duties are separate and distinct, and, if the writ cannot issue against one respondent, it will not issue against the other, and, so the trial court was right in dismissing a petition which could only be granted against both, as was prayed in the petition. *Merrill on Mandamus,* sec. 234a. *Pennington v. Gilbert,* 148 Md. 649, 652, 129 A. 905.

For the reasons assigned, the judgment denying the writ will be affirmed.

*Judgment affirmed, with costs to the appellee.*