MAHONEY *v.* BOARD OF SUPERVISORS OF
ELECTIONS OF TALBOT COUNTY ET AL.

[No. 66, October Term, 1954 (Adv.).]

*Decided, per curiam, August 25, 1954.*

*Opinion filed November 12, 1954.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS and HAMMOND, JJ.

*Francis B. Burch* and *Hyman A. Pressman,* with whom were *William W. Mahoney* and *J. Thomas Clark* on the brief, for the appellant.

*William C. Walsh, Benjamin C. Howard* and *Ralph W. Powers* for the intervenor.

Submitted on brief by *Charles E. Wheeler* and *Walter W. Claggett* for the Board of Supervisors of Elections of Talbot County.

BRUNE, C. J., delivered the opinion of the Court.

This is the second appeal in this case. On the day following its argument in this Court we filed a *per curiam* order affirming the judgment of the Circuit Court for Talbot County which denied and dismissed the appellant's petition for a writ of *mandamus* after a full hearing on the merits.

The case (together with a companion case arising in Queen Anne's County) first came before us on an appeal from an order sustaining a demurrer to the appellant's petition incorporated in the answer of the Supervisors of Election of Talbot County (usually referred to below as the "Supervisors") and a demurrer filed by the intervening respondent, Dr. H. C. Byrd, the appellant's opponent for the Democratic Party's nomination for Governor in the primary election held on June 28, 1954. By a *per curiam* order, since followed by the full opinion

of this Court, we reversed the order sustaining the demurrers. The facts of the case up to that stage of the controversy are fully stated in the opinion written by Judge Delaplaine (*Mahoney v. Supervisors of Elections of Queen Anne's County, Mahoney v. Supervisors of Elections of Talbot County,* 205 Md. 325, 108 A. 2d 143) and will not be repeated here.

Following the remand of the case the Supervisors filed an amended answer and the intervenor filed an answer to the petition. The petitioner joined issue and traversed the answer, and the Supervisors and the intervenor demurred to the traverse. These demurrers were overruled and the case went to trial on the merits.

During the hearing 289 challenged ballots which had been segregated during the recount were introduced in evidence, and 35 of them were not then objected to by either side, thus reducing the number of challenged ballots to 254. The ballots were divided into classes or types designated by letters from A to P, inclusive, depending upon the principal type of objection asserted against them, all of which are described, and many of which are illustrated, in the painstaking and comprehensive opinion of the trial court. (At the hearing there proved to be no ballots classified as belonging to Type C (a check mark) or Type H (shaded), both of which Types were described in the appellant's petition.) Where any ballot was claimed to be defective in more than one respect, the additional defect or defects were noted.

The trial court reviewed all of the challenged ballots, some of which had been cast for Mr. Mahoney and most of which had been cast for Dr. Byrd. The recount had shown a total of 1826 votes counted for Dr. Byrd and 1769 counted for Mr. Mahoney. As a result of the trial court's review of the ballots, 16 votes cast for Dr. Byrd and 12 cast for Mr. Mahoney were eliminated. This reduced the majority for Dr. Byrd from 57 as returned by the Supervisors to 53, but did not change the result of the election. Hence, the writ of *mandamus* did not issue.

The law applicable to the merits of this case was indicated in our previous opinion. We recognized that relief by way of *mandamus* is available for the correction of a clear legal error on the part of the Board of Supervisors. (*Hammond v. Love,* 187 Md. 138, 49 A. 2d 75.) We also recognized that the provision of Code (1951), Article 33, Section 85, for the rejection of ballots on which there may be any mark "other than the cross-mark in a square opposite the name of a candidate" is mandatory. However, our opinion also made it clear that the quoted phrase is not to be construed absolutely literally, for we said: "The test for determining the validity of a ballot is that when an irregularity in the marking of a cross-mark apparently occurred accidentally and in pursuance of the voter's purpose to make a cross-mark as prescribed by the statute, the votes on the ballot should be counted; but when the irregularity was apparently placed on the ballot intentionally and constituted a means of identifying the ballot, the ballot should be rejected."

Almost since the first enactment by the Laws of 1901 (Special Session), Chapter 2, Section 66, of the provision quoted, it has not been construed with literal narrowness.

It is true that in *Duvall v. Miller,* 94 Md. 697, 51 A. 570, some rather sweeping language was used with regard to literal compliance with the text of the then very recently enacted statute. Even that opinion was by a divided Court (4-3) on the validity of ballots on which the end of a cross-mark extended beyond the square; and in less than a year thereafter, in *Coulehan v. White,* 95 Md. 703, 53 A. 786, which is briefly reviewed and summarized in our previous opinion in this case, a more liberal view was taken and some marks not within the square opposite the name of a candidate were held not to invalidate the ballots on which they appeared. It may be noted that of the four Judges who constituted the majority on the point on which this Court divided in *Duvall v. Miller,* three (including the writer of the

*Duvall* opinion) concurred in the *per curiam* opinion in *Coulehan v. White,* and the fourth did not sit in the latter case. Judge Boyd, who was of the minority in *Duvall v. Miller,* wrote the opinion of the trial court in *Coulehan v. White.* This opinion was adopted without dissent and with only one change by the Court of Appeals. That one change involved a construction of the opinion in *Duvall v. Miller* and held valid some ballots which the trial court had rejected on its interpretation of the *Duvall* case.

Since the *Coulehan* case the statute has been amended and liberalized. Chapter 576 of the Laws of 1908 liberalized it in two ways, one of which was to validate ballots of a kind held invalid in *Duvall v. Miller* and *Coulehan v. White* because a cross-mark extended beyond the lines of a square. On the other hand, there was then, and there has been since then, no narrowing by legislation of any of the several liberal and non-literal constructions adopted in the *Coulehan* case. The repeal and re-enactment of the statute without changing the language applicable to these constructions indicates a legislative acceptance of them. *Sonnenburg v. Monumental Motor Tours,* 198 Md. 227, 81 A. 2d 617; *Dept. of Tidewater Fisheries v. Sollers,* 201 Md. 603, 95 A. 2d 306; *Nutwell v. Supervisors of Elections of Anne Arundel County,* 205 Md. 338, 108 A. 2d 149.

The principal contention of the appellant is, in substance, that the Supervisors have discretion only to determine the fact of the existence of a mark (not due to an imperfection in the paper or to a like cause) other than the cross-mark in a square opposite the name of the candidate. This, we think, is too narrow a view of the discretion confided to the Supervisors. It would push the rule of *Hammond v. Love, supra,* too far.

Our previous opinion in this case expressly recognized that the Supervisors, "in making a recount of votes, are vested with discretion in determining whether a ballot should be counted or rejected," and we further said: "We reaffirm the rule that where the Election Super-

visors have not acted in violation of law, their action in counting or rejecting ballots cast in a primary election is not subject to review by *mandamus* in the absence of fraud or arbitrary conduct. *White v. Laird,* 127 Md. 120, 96 A. 318; *Fitzgerald v. Quinn,* 159 Md. 543, 151 A. 660; *Roe v. Weir,* 181 Md. 26, 28 A. 2d 471. On the contrary, where a Board of Election Supervisors has made an obvious mistake of law in counting or rejecting ballots, the court has the power to correct such mistake."

The opinion of the learned trial judge upon which his rulings with respect to the various challenged ballots were based, was in accordance with these views. He said: "To sum it all up succinctly, this Court believes that in the absence of improper motives on the part of the Supervisors, or a charge of fraud or actual arbitrary conduct, a Court of Law will not substitute its judgment for that of the Supervisors by granting a *Mandamus* compelling the Supervisors to reject certain ballots and count others, provided the Supervisors do nothing which is clearly contrary to law." He then proceeded to review each of the challenged ballots and set forth his conclusions with respect to each class and the ballots comprised therein.

The case was tried by agreement of the parties without a jury; and on appeal, the question before us is whether or not on the law and the facts the writ should have issued. *Whitridge v. Pope,* 110 Md. 486, 73 A. 288; *Woods v. Simpson,* 146 Md. 547, 126 A. 882; *Strott v. Broening,* 160 Md. 560, 154 A. 45; *Schriver v. Mayor & City Council of Cumberland,* 169 Md. 286, 181 A. 443; *Hecht v. Crook,* 184 Md. 271, 40 A. 2d 673.

We have already expressed our agreement with the general rules of law set forth in the opinion of the trial court, and the care and thoroughness of its opinion in dealing with each class of alleged defects and with individual ballots have greatly facilitated our review.

As a general observation, we may note that every one of the types of objection noted by the appellant was of a kind with respect to which the Supervisors were re-

quired to exercise their judgment and which called for a determination of fact. Their exercise of judgment has been reviewed by the trial court; and with regard to the vast majority of the challenged ballots, that court has found the evidence insufficient to warrant the conclusion that the Supervisors acted clearly illegally in determining to count the ballots in question. We repeat what we said in our earlier opinion in this case—that there is no statutory right of appeal from the Supervisors to a court for a recount of votes in a primary election. Judicial review is available in such cases only through *mandamus* proceedings and where, as here, there is no charge of fraud, only to redress clearly arbitrary or illegal action. Where the error is obvious and the facts are beyond dispute, as in *Hammond v. Love, supra,* this involves no great delay in ascertaining the result of a primary election. On the other hand, the practical difficulties where paper ballots are still in use inherent in the application or extension of the doctrine of *Hammond v. Love* to the determination of controverted factual details committed to the Supervisors of Elections for decision in the exercise of their discretionary powers, require little, if any elaboration. The time needed for the determination of the result of the primary election contest which gave rise to this case (and others) points them up. That election was held on June 28th and our *per curiam* decision on the merits of this case (which did end the contest) was filed on August 25, 1954. Little time was then left before the date fixed for the mailing of absentee ballots for the general election. How much longer another case which, we were informed, would have followed this one if the judgment of the trial court had been reversed, would have delayed the determination of the outcome of this election is problematical. So is the time which might have been needed for the conclusion of this case, in which, we were told, the intervenor, Dr. Byrd, would have sought, in the event of reversal, to obtain a review of many ballots cast for his opponent and not previously challenged.

The preservation of the secrecy of the ballot is, of course, entirely necessary and proper. So are the reasonably prompt determination of the result of a primary election and the avoidance of the unnecessary disfranchisement of voters due to minor errors or irregularities in marking their ballots. See *White v. Laird,* 127 Md. 120, at 126, 96 A. 318, at 320, where the danger of overrefinements of objections to ballots was clearly pointed out.

Where issues of fact have been honestly considered by Supervisors of Elections and their decisions have stood the test of thorough review by a trial court, the burden of showing that the action of the Supervisors has been clearly illegal is not a light one.

Because of the dangers pointed out in *White v. Laird, supra,* we are reluctant to add unnecessarily to the lore of *Coulehan v. White, supra,* and we shall accordingly deal only briefly with most of the grounds of alleged invalidity of the ballots challenged in this case.

Type A comprises seventy-five ballots in all, of which two were rejected—one for each candidate. Ballots in this Type involve a dot and occasionally some other mark or marks in the square with the cross-mark. These are similar to Class 20 of the challenged ballots in the *Coulehan* case, and ballots of this type were rejected in that case. The action of the Supervisors in counting these ballots, we think, was within the discretionary power vested in them.

Type B consists of ballots on which there is a dot, but not a cross-mark, in a square. Of the thirteen held properly counted six were considered as due to flaws in the paper, and this ruling is clearly correct. The trial court found that the other seven may have been pencil marks and that four of them (if so) were inadvertently made. Because of uncertainty as to their nature, they would all seem to fall within the Supervisors' power of determination; and the four last mentioned would also be within the spirit of the ruling as to Class 21 of the *Coulehan* case and the inadvertent "dragged line" ballot

upheld in *Landover Hills v. Brandt,* 199 Md. 105, 85 A. 2d 449.

Type C was non-existent; the one ballot in Class D was held valid under the *Landover Hills* case, and the appellant abandoned his objection to it in this Court.

Type E was described as comparable to Class 10 in the *Coulehan* case and as involving more lines than are needed for a cross. Ten ballots were rejected and eighteen were counted. These eighteen were found by the trial court to show efforts by nervous persons to retrace one or both lines of a cross-mark. Accordingly, they seem to resemble Class 9 of the *Coulehan* case and to have been properly counted.

Type F contained only one ballot, which showed a "dragged line". The trial court found that it resembled Type D and could have been so designated. It was accordingly properly counted.

Type G was similar to Class 27 of the *Coulehan* case and involved a third line, which produced somewhat of an "H" rather than a cross-mark. This Class was not ruled on in the *Coulehan* case (where there was one for each side). The trial court rejected all seven that were clearly H's and two others which were really stars, like Type E. Of the others twenty were found by the trial court to involve "unquestionably honest attempts to retrace one or both lines of the cross to make them more distinct by persons untrained in the use of writing instruments * * *." While there was found to be "room for reasonable doubts as to many of them," the trial court held that such doubts should be resolved in favor of the voter and that it could not find that the Supervisors had improperly counted them. This holding was in accordance with the ruling as to similar marks in Class 9 of the *Coulehan* case and the spirit of giving the voter the benefit of the doubt as was done with respect to Classes 12 and 21 in the *Coulehan* case. This, we think, was proper.

Of the remaining eight ballots which were counted, five were found to be "honest efforts to complete an arm

of the cross," and three to show a dragging of pencils. Under the rulings with regard to Class 9 of the *Coulehan* case and the *Landover Hills* case, the holding of the trial court was correct with regard to these eight ballots.

There was no ballot of Type H (described as "shaded").

Type I, resembling Class 11 of the *Coulehan* case, which may be described briefly as a cross having only three complete sides or legs instead of four, consisted of three ballots, all of which the trial court held properly counted. We find no error in this holding, which is supported by the *Coulehan* case.

Type J, illustrated in the petition as a double cross, "X X", consisted of eight ballots. The trial court found that all of these ballots involved honest attempts to retrace one or both lines of the cross-mark, as in Types E and G. What has been said with regard to those Types is therefore applicable, and the ruling of the trial court in holding them properly counted is approved.

Type K embraces a somewhat miscellaneous group of forty-eight ballots. One ballot (marked for the appellant) was not counted because it was conceded at the hearing to be invalid, though the reason for its invalidity was not clear to the trial judge and he thought it had been properly counted by the Supervisors. The appellant's brief states that the ballot was invalid because of a small line in the Attorney General box. The appellant further says that it was no worse than marks on other ballots which the trial court held were properly counted. The trial court found that eight of the remaining "Type K" ballots involved extensions of one or both cross-marks made "without design", three involved "retracings" and thirty-five involved "faint dragged lines." We find no error in the trial court's holdings that ballots so marked were properly counted.

Type L, described as "erasures", contained only one ballot. The trial court found that the alleged erasure was not an erasure at all, but was due to a wet pencil mark evidently caused by the voter's effort to overcome

a difficulty due to a flaw in the paper. We find no error in this ruling.

Type M is a kind of catch-all designation for "other marks" on the face of ballots. Ballots in this group are objected to on varied grounds which include two retracings, four insignificant dots difficult to locate, six offset impressions of a wet pencil mark made in folding the ballot, six wavering dragged lines, one faint red smudge made with lipstick or nail polish, two creases in the paper and two punctures of the ballot. Of the last type, one ballot was rejected because the largeness of a pencil dot piercing the paper and the presence of a contiguous smudge would make identification relatively easy, and the other ballot was passed because it was evidently the result of a pencil point breaking. The faint red smudge might be found to fall under Class 23 of the *Coulehan* case (a long pencil mark apparently due to a slip of the pencil) or under Class 18 (ink on the back of the ballot which "probably" got there during the count of the ballots). We do not think that we should overturn the judgment of the Supervisors or the ruling of the trial court as to how this mark should be treated, nor is there any reason why a supposed mark which turns out to be due to a crease in the paper should cause the rejection of a ballot. Impressions made by a wet pencil mark were held not to invalidate ballots under Class 19 of the *Coulehan* case. Insignificant dots difficult to locate seem within the principle of Class 4 of the *Coulehan* case—lines extending almost imperceptibly beyond the square. Retracings and dragged lines are covered by what we have said under Types G and D.

Type N, which includes eleven ballots, is a catch-all for other marks on the back of ballots. Five smudges or lines made "without design" with lipstick, nail polish or possibly a red pencil are covered by what we have said with regard to a red line on the face of a ballot under Type M. The two ballots where incomplete numbers were below the initials of the judge of elections, the ballot where an accidental mark in the same color

as the initials of a judge appeared below them, the ballot where there was an ink spot on the portion of a coupon not torn off and the ballot with "red ink spots only" seem within either the precise holding or the principle applied to a Class 18 ballot in the *Coulehan* case, where a mark due to manifest accident was held not to invalidate a ballot. A "faint pencil 'dragged line' so inconspicuous that it took the Court several minutes to find it" seems to have been properly held not to invalidate the ballot. Compare the reasoning which upheld the validity of Class 4 ballots in the *Coulehan* case (lines extending almost imperceptibly beyond the square).

Type O, allegedly improper initials, covers two ballots. One was rejected; the other was held valid after taking the testimony of the particular judge of elections involved and a comparison of the allegedly improper initials with undoubtedly genuine initials of the same judge. Again we find no error in this ruling.

Type P is described as a "tear." It appears to have occurred in the tearing off of a coupon. A part of the initials of the judge of elections was torn off along with the coupon. We see no error in counting this ballot. Compare *Coulehan* Class 18 and the acceptance in that case of all of the ballots in one ward where the judge of elections put his initials on the coupon and they were torn off along with the coupon.

In a number of instances more than one objection was presented to the counting of a particular ballot. The challenged ballots were placed in the classification covering the principal objection, but any secondary objections were also noted.

As to such secondary objections to ballots classified as Type A the trial court said: "These alleged defects were also reviewed, but they do not appear to invalidate the ballots in question." Secondary objections to ballots classified under other Types were variously stated by the trial court to have been reviewed, examined or considered and "ignored". We understand the trial court's use of the word "ignored" to be equivalent to what was

said at greater length with regard to secondary objections to ballots classified as Type A. Any other meaning would be inconsistent with their having been reviewed, examined or considered.

In summary, the result adverse to the petitioner-appellant at which we have arrived on this appeal, as against the result favorable to him at which we arrived on the previous appeal on the demurrers, is due to the difference between the allegations which stood admitted by the demurrers on the first appeal and the proof developed at the hearing on the merits which is before us on this appeal. The evidence, we think, shows that in making the recount the Supervisors discharged their duties conscientiously and to the best of their ability. It fails, we think, to establish that in the exercise of the discretion confided to them to determine whether or not the challenged ballots should be counted, the Supervisors so clearly fell into error as to show that their decisions were contra to law or unsupported in fact so as to be "clearly illegal." If there were any such errors, they were too few in number to alter the result of the election. Accordingly, we affirmed the order denying the petition.