682 A.2d 237

Thomas M. PELAGATTI

v.

**BOARD OF SUPERVISORS OF ELECTIONS
FOR CALVERT COUNTY et al.**

**No. 134, Sept. Term, 1994.**

Court of Appeals of Maryland.

Jan. 10, 1995.

Opinion issued
Sept. 9, 1996.

**426**

Brent E. Walthall (Kevin C. Gale, on brief), Upper Marlboro, for Appellant.

Jack Schwartz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Mary O. Lunden, Asst. Atty. Gen., all on brief), Baltimore, Stephen V. Wehner (Wehner & York, Washington, DC; Robert Crum, Prince Frederick, argued and on brief), for Appellees.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

## ORDER

PER CURIAM.

For reasons to be stated in an opinion later to be filed, it is this 10th day of January, 1995

ORDERED, by the Court of Appeals of Maryland, that the judgment of the Circuit Court for Calvert County in favor of Anthony J. O'Donnell as the duly elected member of the Maryland House of Delegates from District 29–C is affirmed, with costs. Mandate to issue forthwith.

## OPINION

ELDRIDGE, Judge.

The dispute in this case is over the validity of absentee ballots cast in the 1994 general election for House of Delegates seat 29–C. This Court issued an order on January 10, 1995, affirming the circuit court's judgment which had upheld the decision of local election officials to count the challenged ballots. We now set forth the reasons for our order.

### I.

Appellant Pelagatti and appellee O'Donnell were candidates for the 1994 general election for the House of Delegates seat for District 29–C which includes parts of Calvert and St.

Mary's Counties.[1] The election was held on November 8, 1994, and the next day the Boards of Supervisors of Elections for both counties canvassed the votes. Prior to the counting of any absentee ballots, Pelagatti had received a total of 5,565 votes and O'Donnell had received 5,539 votes, a difference of 26 votes in Pelagatti's favor.

On November 10, 1994, the Calvert County Board of Supervisors of Elections[2] met to count the 494 absentee ballots which it had received.[3] After an initial count of 175 absentee ballots, a representative of one of the candidates for Governor raised the question of whether each absentee ballot previously counted had been accompanied by an "Application for Absentee Ballot." These applications were supplied by the State Administrative Board of Election Laws, and, according to the representative of the gubernatorial candidate, an application was required by Maryland Code (1957), Art. 33, § 27–4, to be returned by a voter to the Board of Supervisors of Elections

---

1. District 29–C was created under the 1992 Legislative Districting Plan and went into effect with the 1994 primary and general elections. It encompasses the southern portion of Calvert County and two precincts in St. Mary's County. Maryland Code (1984, 1995 Repl.Vol.), §§ 2–202(29)(c), 2–203 of the State Government Article.

2. For purposes of canvassing ballots, the local Boards of Supervisors of Elections serve as the boards of canvassers. Code, (1957, 1993 Repl. Vol.), Art. 33, § 17–2(a). The duties of the board of canvassers in counting absentee ballots is set out in Art. 33, § 27–9(b), as follows:

   "(b) Duties of boards.—(1) Subject to the provisions of paragraph (2), at any time after 4 p.m. on the Wednesday following election day and not later than the canvass of the votes cast at the regular voting places in this State at any election, the several boards shall meet at the usual place for holding the circuit court for the county or at the usual offices of the board and shall proceed to count, certify and canvass the absentee ballots contained in the ballot envelopes. Each board of canvassers shall keep the ballots safe from tampering until the canvass is completed. The state Administrative Board of Election Laws and the several boards shall take all appropriate and feasible steps to protect the privacy of all absentee ballots.

   "(2) The canvass may not be completed until all absentee ballots that have been received timely have been counted."

3. In addition to the absentee ballots received in Calvert County, a total of 78 absentee ballots were also cast in St. Mary's County. The parties have not challenged the validity of these 78 absentee ballots.

prior to the issuance of an absentee ballot. Section 27–4 states:

> "Except as provided in § 27–2 of this article, a qualified voter desiring to vote at any election as an absentee voter shall make application in writing to the board for an absentee ballot, which application must be received not later than the Tuesday preceding the election. The application shall contain an affidavit, which need not be under oath but which shall set forth such information, under penalty of perjury, as may be required by the State Administrative Board of Election Laws. Upon receipt of the application the board shall issue, to the voter or a duly authorized agent, an absentee ballot." [4]

Specifically, the representative of the gubernatorial candidate maintained that the application for an absentee ballot contains statutorily prescribed language, in the form of an affidavit, by which the registered voter, by signing the application, affirms under penalty of perjury that he or she is eligible to vote as an absentee.[5] Accordingly, the representative's

---

4. According to the evidence in this case, voters who would be absent from their precinct on the day of election would contact the Board of Supervisors of Elections and request in writing an absentee ballot. The request form used by the Calvert County Board stated that "I would like to receive an application to vote by Absentee Ballot because" and then listed the permissible reasons, requiring the applicant to check one of them. The form contained a place for the voter's address, and required the voter's signature. In response to this request, the Board, before sending the ballot, would ordinarily send an "Application For Absentee Ballot" to be completed and returned by the voter, and then upon the receipt of this application, the Board would issue the ballot. Some requests for absentee ballots, however, were made so close to the election that the Board thought that it would be impossible to have the voter fill out and return the application for an absentee ballot and then be sent the actual ballot within the statutorily prescribed time. Thus, in order not to disenfranchise these voters, the Board sent the ballot to them without first requiring the receipt of an application for an absentee ballot.

5. The pre-printed form supplied by the State Administrative Board of Election Laws was as follows:

argument continued, if an absentee ballot was received that did not have a corresponding signed application containing an affidavit, the ballot should not have been counted.

In light of the question raised by the representative of the candidate for Governor, the Board reexamined the ballot envelopes from which the first 175 absentee ballots had been removed and counted. The Board determined that 25 of these ballots did not have corresponding applications for an absentee ballot. When this irregularity was discovered, however, the 175 ballots had been separated from their envelopes, and the ballots lacked identifying characteristics once removed from their envelopes. Thus, although it could be determined

---

"STATE OF MARYLAND
BOARD OF SUPERVISORS OF ELECTIONS OF
_____ COUNTY OR BALTIMORE CITY

1994 GUBERNATORIAL ELECTIONS
APPLICATION FOR ABSENTEE BALLOT—REGISTERED VOTER
(Print All Information Except Signature)

Under penalty of perjury, I, _____ .
(Full Name)

Address _____
(No. and Street) (City or Post Office) (Zip Code)

a registered voter of _____ County or Baltimore City, MD

Telephone Number(s) _____ Date of Birth _____
(Month–Day–Year)

Party Affiliation _____ Note: Only voters affiliated with the Democratic or Republic Party may vote for candidates, including candidates for circuit court judge, to be nominated at a closed primary election of that party. All registered voters may vote in a general election and in a Board of Education or other nonpartisan primary.

hereby apply for an absentee ballot in the following election(s):

(check one or both) \_\_\_\_ Primary Election of September 13, 1994.
\_\_\_\_ General Election of November 8, 1994.

I am unable to vote in person and am entitled to vote by absentee ballot under Article 33 of the Maryland Code. (Review qualification and deadline information on reverse side of application).

---

_____ _____
(Date) (Signature of Voter—sign as registered)"

from the envelopes that 25 ballots did not have corresponding applications for absentee ballots, it was impossible to ascertain from the documents which 25 of the 175 ballots fell into this category. Therefore, the Board could not determine how many of the 25 ballots were for Pelagatti and how many of the 25 ballots were for O'Donnell because of the commingling.[6]

After this concern was raised, measures were taken to segregate the remaining ballots to be counted that did not have the accompanying application for an absentee ballot. It was discovered that 19 additional ballots also lacked applications. Despite this alleged irregularity, however, the Board included these 19 ballots in its final count and also included all 175 absentee ballots counted previously.[7] The final election

6. On November 10, 1994, the State Administrative Board of Election Laws sent a memorandum by fax to the local election boards highlighting the potential problem of counting ballots that did not have corresponding applications for absentee ballots. According to testimony presented in circuit court, however, the Calvert County Board of Supervisors of Elections did not receive the memorandum until after the completion of counting the absentee ballots.

7. The colloquy in the circuit court between Pelagatti's attorney and the administrator of the Calvert County Board of Supervisors of Elections regarding the decision to count the allegedly tainted ballots was as follows:

"Q. Was there a process that you used or that the Board used to determine whether or not they were going to accept those votes? A. Yes, the Board grouped together and discussed it, and it was under the opinion of the Board, as a majority, that they would segregate the ballots and count them ... at the end, so that if need be—if the votes needed to be removed or kept in, they were there and the count was there.

Q. But it was their decision to go ahead and include those in the final tally of the total that— A. No. The final decision was left up to the State Board [of Elections].

Q. But when you certified the results of the election were those— A. Yes, when I certified the results of the election I called the State Board to ask them, do I include those votes or take them out, and they said I was to include all votes until further notified.

*      *      *      *      *      *

Q. It's my understanding that in order to reject a vote it has to be a unanimous decision of the Board, is that correct? A. Yes

tally, including all absentee ballots from both counties, certified by the Boards of Supervisors of Elections for Calvert and St. Mary's Counties on November 18, 1994, was 5,807 for Pelagatti and 5,839 for O'Donnell, a difference of 32 votes in O'Donnell's favor.

On November 23, 1994, Pelagatti filed in the Circuit Court for Calvert County a "Petition to Appeal and Contest Election," requesting that the court order the Board of Supervisors of Elections of Calvert County not to count certain absentee ballots or, alternatively, to order a new election. Pelagatti's petition, as amended, named as defendants the Board of Supervisors of Elections for Calvert County, the State Administrative Board of Elections Laws, and O'Donnell.

At the circuit court hearing, Pelagatti argued that Art. 33, § 27–4, required that a registered voter, wishing to cast an absentee ballot, complete an application that sets forth in affidavit form that the person is eligible to vote as an absentee. Specifically, Pelagatti focused on the language in § 27–4 that states that the "application shall contain an affidavit, which need not be under oath but which shall set forth such information, under penalty of perjury, as may be required by the State Administrative Board of Election Laws." He maintained that this language requires an absentee voter to warrant by affidavit that he or she is entitled to vote absentee, and the language and voter's signature on the application for an absentee ballot satisfies this requirement. Moreover, Pelagatti contended that because 44 absentee ballots cast in the election for the seat in the House of Delegates from District 29–C lacked the accompanying applications for absentee ballots, these ballots should not have been counted.

Pelagatti acknowledged, however, that 25 of the 44 ballots had been commingled with proper ballots before anyone had raised the issue, that, therefore, it was impossible to determine whether the 25 ballots were for O'Donnell or himself,

---

Q. And there was no unanimous decision of the Board to reject any of these votes that you had segregated.
A. Right."

and that rejection of the remaining 19 identifiable ballots would not alter the outcome of the election. Consequently, in addressing the issue of whether the election outcome would have been different if the improper ballots had not been counted, Pelagatti argued that all Calvert County absentee ballots cast in the election were "tainted" and should be rejected. Alternatively, he maintained that, because 25 of the invalid ballots were commingled with 150 proper ballots, all 175 ballots should be discarded, along with the additional 19 ballots later found to be lacking applications.[8] Finally, he suggested that the 44 improper ballots alone "might" alter the outcome of the election, with Pelagatti winning by 1 to 4 votes.[9]

In response, O'Donnell contended that the ballots were not invalid for lack of corresponding applications for absentee ballots. Rather, according to O'Donnell, the written request for an absentee ballot application and the absentee ballot envelope, signed by the voter, substantially complied with the requirement set forth in Art. 33, § 27–4.[10] In addition, O'Don-

---

**8.** Of the 175 ballots received prior to discovering that 25 ballots were missing applications for absentee ballot, 96 ballots were for O'Donnell, 66 were for Pelagatti, and 3 were for neither candidate. In addition, of the 19 segregated ballots found to be lacking applications, 14 were for O'Donnell, 3 were for Pelagatti, and 2 were for neither candidate. Subtracting all of these votes from both candidates would result in a final ballot count of 5,738 for Pelagatti and 5,729 for O'Donnell, a difference of 9 votes in Pelagatti's favor.

**9.** The final election results showed that O'Donnell had won by 32 votes. Of the 44 presumably invalid ballots, 19 were segregated when counted, and the results of those ballots were 14 for O'Donnell, 3 for Pelagatti, and 2 for neither candidate. Thus, Pelagatti argued that taking 14 ballots from O'Donnell and 3 from himself would reduce the gap between the candidates to 21 votes. In addition, Pelagatti assumed that O'Donnell received at least 22 votes from the remaining 25 allegedly improper ballots, and he would also have removed these ballots from O'Donnell's total, leaving as a possible result a victory for Pelagatti by as much as 4 votes or as little as 1 vote. Pelagatti's "assumption" that 22 of the 25 commingled ballots contained votes for O'Donnell was not supported by any evidence.

**10.** The language on the back of the ballot envelope appeared as follows:

nell asserted that if 44 ballots were in fact invalid, 25 of these 44 ballots were commingled with 150 concededly valid ballots, and that the 25 invalid ballots should not result in the disenfranchisement of 150 voters casting valid ballots. O'Donnell maintained that Pelagatti had failed to meet his burden of proof that the outcome of the election would have been different without the invalid ballots. Finally, O'Donnell asserted that Pelagatti should be barred from challenging the validity of the 25 commingled ballots when neither he nor his representative raised the issue prior to the counting and commingling of the absentee ballots.

Following the hearing, the circuit judge denied Pelagatti's request for relief, stating:

"The Court does not find that there's any law or requirement that under these circumstances . . . any ballot should be thrown out. . . . [T]he court does not believe their ballots would be thrown out anyway because they had done all they needed to [do in order to be] eligible voters. The only thing [the voters] didn't do, and it wasn't their fault, they didn't get around the law or not comply intentionally with the statute, they were never told the other things they

---

**"OATH OF ABSENTEE VOTER
PRINT ALL INFORMATION EXCEPT SIGNATURE**

"I, _____, do hereby swear (or affirm) that I am legally qualified to vote in the _____ Election to be held on _____; that I reside in _____ City or County, Maryland, as stated in my application for absentee voting; that I will be unable to vote in person on the day of such election and am entitled to vote by absentee ballot under Article 33 of the Maryland Code or the Overseas Citizen Voting Rights Act of 1975; that I have not voted nor do I intended to vote elsewhere in this election. The within ballot was voted by me. The ballot, if mailed, was completed and mailed no later than the day before the election.

_____
Signature of Absentee Voter

WARNING: Any person who shall violate any of the provisions of the Election Code governing absentee voting shall, upon conviction, be sentenced to pay a fine of not more than one thousand dollars ($1,000), or be sentenced to imprisonment for not more than two years, or both, in the discretion of the court."

had to do to vote absentee. . . . So, the Court feels it would be a substantial injustice to disenfranchise the 150 people who went through the process and did so because 25 others and 19 others voted in good faith. . . . "

Pelagatti immediately noted an appeal, and on January 9, 1995, this Court issued a writ of certiorari prior to any proceedings in the Court of Special Appeals. As previously mentioned, on January 10, 1995, after hearing oral argument, this Court affirmed the circuit court's judgment in favor of O'Donnell.

## II.

Both in the circuit court and in this Court, Pelagatti argued that the basis for his action was Code (1957, 1993 Repl. Vol.), Art. 33, subtitle 19, consisting of §§ 19–1 through 19–5. Subtitle 19 of the Election Code provides in relevant part as follows:

"§ 19–2. **Judicial challenges.**

If no other timely and adequate remedy is provided by this article, and by filing a petition in accordance with the provisions of § 19–3 of this subtitle, any registered voter may seek judicial relief from any act or omission relating to an election, whether or not the election has been held, on the grounds that the act or omission:

(1) Is inconsistent with this article or other law applicable to the elections process; and

(2) May change or have changed the outcome of the election."

\*    \*    \*    \*    \*    \*

"§ 19–5. **Judgment.**

Upon a finding, based upon clear and convincing evidence, that the act or omission involved materially affected the rights of interested parties or the purity of the elections process and:

(1) Might have changed the outcome of an election already held, the court shall:

(i) Declare null and void the election for the office, offices, question, or questions involved and order that the election be held again on a date set by the court; or

(ii) Order any other relief that will provide an adequate remedy."

\*    \*    \*    \*    \*    \*

According to Pelagatti, the Board's counting 44 absentee ballots which had no corresponding applications constituted an "act" which was "inconsistent with" § 27–4 of Article 33, and this act "[m]ight have changed the outcome of" the election, within the meaning of Art. 33, §§ 19–2(1) and 19–5(1). In this Court, Pelagatti requested "the Court to disqualify the [19] separated improper votes as well as the 175 votes which were commingled with the 25 improper votes. Alternatively, we ask[ ] the Court to disqualify all of the absentee ballots." (Appellant's brief at 12).

██  Although we do not suggest that the result in this case would have been any different if subtitle 19 of the Election Code were the appropriate statutory basis for Pelagatti's action, we point out that this action was not authorized by subtitle 19. Section 19–2 authorizes a judicial action by a registered voter only "[i]f no other timely and adequate remedy is provided by this article...." [11] Art. 33, § 27–10, does provide a timely and adequate judicial review remedy for, *inter alia*, "[c]ontests concerning ... the validity of any ballot under this subtitle...." [12]

---

11. With regard to the requirements for maintaining an action and obtaining relief under Art. 33, §§ 19–1 through 19–5, *see Snyder v. Glusing*, 308 Md. 411, 520 A.2d 349 (1987); *Snyder v. Glusing*, 307 Md. 548, 515 A.2d 767 (1986). *See also Kelly v. Vote Know Coalition*, 331 Md. 164, 171 n. 2, 626 A.2d 959, 963 n. 2 (1993).

12. Art 33, § 27–10, provides as follows:

"§ 27–10.  Contests and appeals.

(a) *Decisions by board.*—Contests concerning registration, voting or the validity of any ballot under this subtitle shall be decided by the board having jurisdiction of the matter.

(b) *Unanimous vote by board.*—No registration shall be denied and no ballot rejected except by the unanimous vote of the entire board.

Pelagatti's complaint was that 44 absentee ballots were invalid under § 27–4, which is in the same subtitle as § 27–10. Pelagatti was a candidate who was aggrieved by the Board's decision concerning the ballots; consequently, he was entitled to judicial review of the Board's decision under § 27–10(c). Because of the availability of the judicial review action under § 27–10, no action could be brought by Pelagatti under subtitle 19. Moreover, Pelagatti's judicial action was timely under the requirements of § 27–10(d), (e) and (f).

## III.

This Court has, "on a number of occasions, expressed the view that 'unimportant mistakes made by election officials should not be allowed to thwart the will of the people freely expressed at the ballot box' or that 'mere irregularities ... should not be allowed to set aside what the voters have decided.'" *Lamb v. Hammond,* 308 Md. 286, 310–311, 518 A.2d 1057, 1069 (1987), quoting *Wilkinson v. McGill,* 192 Md. 387, 393, 395, 64 A.2d 266, 269–270 (1949).

█ As stated by the Court in *McNulty v. Board of Elections,* 245 Md. 1, 8–9, 224 A.2d 844, 848 (1966), "[i]t is ...

---

(c) *Right to [judicial review].*—Any candidate or absentee voter aggrieved by any decision or action of such board shall have the right of [judicial review in] the circuit court for the county to review such decision or action, and jurisdiction to hear and determine such [actions] is hereby conferred upon said courts.

(d) *Procedure for [judicial review].*—Such [actions] shall be taken by way of petition filed with the appropriate court within five days from the date of the completion of the official canvass by any board of all the votes cast at any election and shall be heard de novo and without a jury by said court as soon as possible.

(e) *Appeal to Court of Special Appeals.*—There shall be a further right of appeal to the Court of Special Appeals, provided such appeal shall be taken within 48 hours from the entry of the decision of the lower court complained of, and all such appeals shall be heard and decided on the original papers, including a typewritten transcript of the testimony taken in such cases, by the Court of Special Appeals, as soon as possible after the same have been transmitted to that Court.

(f) *Transmission of record to Court of Special Appeals.*—The original papers, including the testimony, shall be transmitted to the Court of Special Appeals within 5 days from the taking of the appeal."

axiomatic that unnecessary disenfranchisement of voters due to minor errors or irregularities in casting their ballots, in the absence of fraud, should be avoided." The Court went on to point out that where an election board's error "does not interfere with the fair expression of the will of the voters, the result of the election need not be disturbed." 245 Md. at 9, 224 A.2d at 849. *See also, e.g., Mahoney v. Sup. of Elections,* 205 Md. 380, 390, 109 A.2d 110, 115 (1954) ("avoidance of the unnecessary disenfranchisement of voters due to minor errors or irregularities in marking their ballots" is important); *Mahoney v. Sup. of Elections,* 205 Md. 325, 336, 108 A.2d 143, 147–148 (1954); *Town of Landover Hills v. Brandt,* 199 Md. 105, 109, 85 A.2d 449, 451 (1952); *White v. Laird,* 127 Md. 120, 126, 96 A. 318, 320 (1915) (stating, with regard to the contention that primary election ballots were not marked with precisely the type of pencil prescribed by the law, that "it might have a tendency to cause the average voter to believe that the primary election law of Maryland is a snare and delusion, rather than a method of obtaining honest nominations, if Courts must hold ballots to be invalid for such reasons"); *Coulehan v. White,* 95 Md. 703, 53 A. 786 (1902).

In addition, as pointed out by Judge Wilner for this Court in *Lamb v. Hammond, supra,* 308 Md. at 311, 518 A.2d at 1069, the Court has "endeavored to sustain votes that were in substantial compliance with the requirements of law." *See also Hammond v. Love,* 187 Md. 138, 145–146, 49 A.2d 75, 78 (1946) ("partial compliance [with a legal requirement], notwithstanding non-compliance in some details, may constitute such substantial compliance that the election or the vote in question will not be invalidated"); *Roe v. Wier,* 181 Md. 26, 30, 28 A.2d 471, 473 (1942).

On the other hand, "we have never sanctioned the counting of ballots that were plainly in violation of a law particularly designed to protect the integrity of the elective process." *Lamb v. Hammond, supra,* 308 Md. at 311, 518 A.2d at 1069. Or, as Chief Judge Marbury explained for the Court in *Wilkinson v. McGill, supra,* 192 Md. at 395, 64 A.2d

at 270, the general principle that irregularities will not invalidate ballots or elections does not apply when election officials violate "a preemptory requirement designed to safeguard the integrity of elections, the neglect of which presents an apparent opportunity for fraud." *See also Hammond v. Love, supra,* 187 Md. at 146–149, 49 A.2d at 78–80. Nevertheless, "the burden of showing that the action of the Supervisors [of Elections] has been clearly illegal is not a light one." *Mahoney v. Sup. of Elections, supra,* 205 Md. at 390, 109 A.2d at 115.

In light of these principles, there may well be merit in O'Donnell's argument that the 44 absentee ballots were not invalid and that there was substantial compliance with the requirements of Art. 33, § 27–4. The written and signed request for an application for an absentee ballot, coupled with the signed absentee ballot envelope, appeared to contain all of the information which would have been contained in the application for an absentee ballot. The circuit court in this case found that the voter, by signing the absentee ballot envelope, attested to the same facts that the voter would have attested to if he or she had signed an application for an absentee ballot. Furthermore, there was not a shred of evidence that any of the Calvert County absentee ballots counted by the Board were cast by ineligible persons. In addition, there is no evidence that any voter was able to vote twice, once by absentee ballot and once personally.[13]

---

13.  The following testimony was elicited during the circuit court hearing from the Administrator of the Calvert County Board of Supervisors of Elections:

"Q. How do you ensure that an individual that voted absentee ... [did] not vote personally at the polls?

"A. When a person is sent an absentee ballot, we have a computer system in our office and we input their name and address and all the information, that they applied for a ballot, a ballot was sent, and it's also written on the top of each paper that goes into those notebooks. Then, we input them into a State computer system which removes them from the computer runs that would go to the polling houses. If time is of the essence ... we take a magic marker and mark that person's name out of the precinct book that goes to the polling house."

Under all of these circumstances, and considering the principles set forth in the Maryland cases, it would not seem that Pelagatti met his burden of showing that the 44 absentee ballots, not accompanied by applications on the form specified by the State Administrative Board of Election Laws, were clearly illegal.[14]

## IV.

Nevertheless, even if we assume *arguendo* that the absentee ballots not accompanied by applications were clearly illegal, Pelagatti would not have prevailed. In order to invalidate or change the results of the election in a case such as this, the challenger must demonstrate that the illegality altered the outcome of the election. *See, e.g., McNulty v. Board of Elections, supra,* 245 Md. at 11–13, 224 A.2d at 849–851; *Mahoney v. Sup. of Elections, supra,* 205 Md. at 395, 109 A.2d at 118 ("If there were any such [illegal ballots], they were too few in number to alter the result of the election"); *Mahoney v. Sup. of Elections, supra,* 205 Md. at 335, 108 A.2d at 147 (an election challenger is not entitled "to demand an abstract right which would be unaccompanied by any substantial benefit. . . . In the instant cases it was beyond dispute that if the challenged ballots were rejected . . ., the petitioner would obtain the majority"); *Town of Landover Hills v. Brandt, supra,* 199

---

**14.** It is noteworthy that Ch. 2 of the Acts of 1996, *inter alia,* amended Art. 33, § 27–4, to delete the requirements that an application for an absentee ballot contain an affidavit and that the information be given under penalty of perjury. According to the bill analysis prepared by the House of Delegates Commerce and Government Matters Committee on H.B. 128, which became Ch. 2, the bill was recommended by the Maryland Task Force to Review the State's Election Law based on its finding

"that for a number of years some local election boards accepted signed letters of application for an absentee ballot without the required affidavit. After the 1994 gubernatorial election this practice was challenged and the validity of hundreds of ballots was questioned although the ballot envelope in which the ballots were returned bore a signed affidavit. The Task Force reported that because an affidavit is already required on the actual ballot envelope, the first affidavit in connection with the *application* for an absentee ballot is redundant."

Md. at 109, 85 A.2d at 451; *Wilkinson v. McGill, supra,* 192 Md. at 395, 64 A.2d at 271 (stating, with regard to several alleged election illegalities, that "none of them are shown to have affected the ultimate result, and ... they should not be allowed to set aside what the voters have decided").

■ Moreover, in determining whether invalid ballots affected the outcome of an election, the courts will not guess or speculate or "resort to probability" as to which candidate or which side of an issue the invalid ballots favored. *McNulty v. Board of Elections, supra,* 245 Md. at 11, 224 A.2d at 850; *Wilkinson v. McGill, supra,* 192 Md. at 402–403, 64 A.2d at 274. Instead, the party challenging the election results has the burden of proving that the illegality changed the outcome of the election.

■ For example, in *Wilkinson v. McGill, supra,* 192 Md. 387, 64 A.2d 266, this Court considered whether the casting of illegal votes should invalidate a referendum election with respect to an Act creating a sanitary district in Allegany County. According to the Court (192 Md. at 392, 64 A.2d at 269),

> "there was an illegal registration of 26 people of whom 23 voted; and that as the majority in favor of the Act was only 16, these illegal votes, if cast in favor of the Act, carried the election, whereas, if they had not voted, it is probable that the election would have been decided the other way."

In rejecting the plaintiff's argument that the election should be set aside because the 23 illegal ballots probably affected the outcome of the election, Chief Judge Marbury, after reviewing numerous cases throughout the country, explained for the Court (*Wilkinson v. McGill, supra,* 192 Md. at 402, 64 A.2d at 274):

> "The question is by no means free from difficulty, but we think the weight of authority and the better reasoning uphold the view that complainants, desiring to avoid an election because illegal votes are cast, have upon them the burden of proving for whom these votes are cast. They cannot thrust that burden upon the Court by arguing that

there is a probability that such votes were cast for the side having the majority. They must prove, or at least attempt to prove, how the illegal voters voted. If direct proof cannot be obtained from the illegal voters themselves, other evidence of a circumstantial nature may be offered."

Similarly, in *McNulty v. Board of Elections, supra,* 245 Md. 1, 224 A.2d 844, this Court considered whether a candidate for the Democratic nomination for State Senator could be awarded 136 ballots that had been cast in error, with the result that none of the 136 ballots were credited to any of the candidates in the election. The error occurred when election officials failed, in violation of the law, to lock lever 7E on the voting machine and to cover line E in column 7. There were four candidates for the nomination, and McNulty was listed fourth in column 7. His corresponding lever was 7D. McNulty argued that his campaign slogan, which requested voters to vote the "bottom line," meant (245 Md. at 8, 224 A.2d at 848)

"that the obvious intention of the 136 voters who had cast votes in block 7E, [the bottom line], was to vote for him and that since the [Board of Elections] had found that this was 'probably' their intention, these 136 votes should be awarded to him . . . ."

If the 136 votes had been awarded to McNulty, he would have been the winner.

In rejecting McNulty's argument, this Court discussed *Wilkinson v. McGill, supra,* and reiterated that an election would not be set aside based on the argument that " 'there is a probability that the [illegal] votes were cast for the side having the majority.' " 245 Md. at 11, 224 A.2d at 850. The Court continued (*ibid.*):

"The problem of ascertaining for whom the 136 votes in the present case were intended, is far more complicated than in *Wilkinson, supra,* because in this case no one knows who any of the 136 people may be who pulled lever 7E, intending to vote for McNulty. . . . Certainly applying the rationale of *Wilkinson,* to the present case, it eliminates the resort to 'probability' urged by the appellant."

The Court in *McNulty* went on to reject a test based upon " *'what the Court guesses'* " would have happened but for the illegality. 245 Md. at 12, 224 A.2d at 850, quoting with approval *In re Primary Election April 28, 1964,* 415 Pa. 327, 203 A.2d 212, 216, 219, *cert. denied,* 379 U.S. 846, 85 S.Ct. 86, 13 L.Ed.2d 51 (1964).

Applying these principles to the present case, it is clear that Pelagatti failed to show that the allegedly invalid absentee ballots changed the outcome of the election. These ballots would have altered the outcome only if a high percentage of the 25 commingled ballots had been cast for O'Donnell. There is utterly no evidence in this case disclosing for whom any of these 25 ballots had been cast.[15] It would be pure speculation for a court to assume that a sufficient number of the 25 ballots had been cast for O'Donnell so as to affect the outcome. Such an exercise in guesswork is not permitted in an action under Art. 33, § 27–10.

---

**15.** Although "probability" is not the test in this case, it is noteworthy that the only evidence concerning "probability" was against Pelagatti's position. At the circuit court hearing, O'Donnell called as a witness a statistician. This witness, calculating the probability of Pelagatti winning the election under the various hypotheticals Pelagatti proffered, concluded that the "probability of Mr. Pelagatti winning is less th[an] one-half of one percent" or "less than one in a million."